2019 PA Super 268

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
MARCOS A. BENITEZ :
:
Appellant : No. 1069 EDA 2018

Appeal from the Judgment of Sentence March 14, 2018
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0004588-2017

BEFORE: BENDER, P.J.E., NICHOLS, J., and STEVENS, P.J.E.[*]

OPINION BY NICHOLS, J.: **FILED SEPTEMBER 3, 2019**

Appellant Marcos A. Benitez appeals from the judgment of sentence imposed following his convictions for possession of a controlled substance, possession with intent to deliver a controlled substance, and possession of drug paraphernalia.[1] Appellant claims that the trial court erred in denying his motion to suppress evidence obtained after a traffic stop escalated into a drug trafficking investigation and arrest. We affirm.

The trial court summarized the background of this matter as follows:

On May 9, 2017 at approximately 11:55 pm, Officer Tyson [Mathew[2]] initiated a traffic stop of a 2010 silver Honda Accord [(the Honda)] with a suspended registration. The [Honda] in question was traveling southbound on Route One in Bensalem Township, Bucks County. After initiating the stop, Officer

---

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(16), (30), and (32), respectively.

[2] Officer Mathew was in a marked police car and in full uniform.

[Mathew] approached the passenger side and observed the [Honda] had two occupants: [Appellant] in the driver's seat and a passenger later identified as Victor Matos-Ortiz [(the passenger)]. In the back seat, Officer [Mathew] observed numerous bags of food. Officer Mathew thereafter introduced himself to the [Honda]'s occupants and asked [Appellant] for his driver's license and the [Honda]'s registration. Officer [Mathew] then inquired about who owned the [Honda]. [Appellant] responded that it was owned by a friend but could not remember the friend's name. Upon checking the [Honda]'s registration information, Officer [Mathew] observed that the [Honda] was registered to a "Jose Liriano." The [Honda] was also being operated with a single key in the ignition. Through his training and experience, Officer [Mathew] had learned that a vehicle registered to a third party which is also operated by a single key in the ignition is an indication of narcotics trafficking.

Officer [Mathew] then inquired about the origin and destination of [Appellant's] trip. [Appellant] stated that he was from New York on the way to see his girlfriend who lived in Philadelphia. Officer [Mathew] knew that New York is a known narcotics source area. Given his training and experience, Officer [Mathew] also knew that the location of the traffic stop was along a known drug trafficking corridor.

Order, 1/10/18, at 1-2.

The record further reveals the following details regarding the initial traffic stop and the subsequent narcotics investigation.[3] Officer Mathew

---

[3] The suppression record included a "dash cam" recording of the stop and subsequent investigation, which were admitted as Exhibit CS-1 (Exhibit 1). The recordings were contained on a single disk containing two parts. We refer to the recordings as Exhibit 1, Part 1 and Part 2. Part 1 begins with Officer Mathew driving along Route 1 and ends while an officer is searching the driver's compartment of the Honda. Part 2 begins with the search of the driver's compartment by the officer. There is no indication that there was a substantial gap in time between when Part 1 ended and Part 2 began. However, where relevant, we refer to the time elapsed when playing each part because no date or time-stamp appears on the recordings.

initiated the traffic stop by activating his emergency lights. Ex. 1, Part 1 at 0:30. Appellant pulled the Honda over to the right curb and stopped without incident. *Id.* at 1:00. There was a large grassy area along the right side of roadway.

Officer Mathew exited his police vehicle and approached the passenger side of the Honda. *Id.* at 1:00-1:50. Officer Mathew asked for Appellant's license and the registration and insurance information for the Honda. *Id.* at 1:50-2:00. Officer Mathew asked, "Whose car is this," and Appellant responded, "My friend's car." *Id.* at 2:10-2:15. Officer Mathew informed the occupants that he stopped them because the insurance for the Honda was cancelled. *Id.* at 2:15-2:20.

Officer Mathew again asked for the registration and insurance cards. *Id.* at 2:20-2:35. Officer Mathew received the paperwork and while looking down at the documents, the officer asked, "Who is this, who does this car belong to again?" *Id.* at 2:35-2:45. When Appellant said "my friend," the officer asked, "Who's your friend?" *Id.* Appellant responded, "Huh?" *Id.* at 2:45.

Officer Mathew continued to look down at the paperwork for several seconds, and then indicated that the insurance paperwork Appellant gave him was a "payment thing" and asked whether Appellant had the insurance card for the Honda. *Id.* at 2:45-2:55. The officer stated, "Let me see that right there," and additional paperwork was passed to the officer. *Id.* at 2:55-3:00. The officer asked whether a payment was made, and Appellant responded in the affirmative. *Id.* at 3:05-3:15. The officer told Appellant that a report

indicated there was no insurance for the Honda.  *Id.* at 3:15-3:20.  The officer asked whether Appellant had a phone number for "him," apparently referring to a name on the paperwork.  *Id.* at 3:15-3:20.  The officer again asked, "What's his name?"  *Id.* at 3:20-3:25.  There was an inaudible response on the recordings, after which the officer stated, "OK, I got you."  *Id.*

Officer Mathew looked down at the paperwork that was handed to him and asked, "Where are you guys heading?"  *Id.* at 3:25-3:35.  Appellant stated that he was coming from New York and going to see his girlfriend in Philadelphia.  *Id.* at 3:35-3:50.

Officer Mathew then asked whether the passenger was also from New York and requested the passenger's identification.  *Id.* at 3:50-4:05.  Appellant suggested that the passenger did not speak English.  *Id.*

After this initial discussion, Officer Mathew walked around the front of the Honda, past the driver side of the Honda, and back to his police vehicle.  *Id.* at 4:25-5:10.  While walking around the Honda, the officer told Appellant that the Honda's inspection sticker was also expired.  *Id.* at 4:45.  The officer joked about the Honda being a friend's car.  *Id.* at 4:45-5:10.  Approximately four minutes elapsed between the time Appellant stopped the Honda and Officer Mathew returned to his vehicle.  *See id.* at 1:00-5:10.

Once Officer Mathew returned to his vehicle, he waited for approximately two minutes for his backup.[4]  Officer Bailey[5] arrived at the scene, and Officer Mathew stated, "I think I have something."  *See* N.T., 11/15/17, at 46; Ex. 1, Part 1 at 7:20.

Officer Mathew indicated that: (1) the Honda came off of the turnpike; (2) the Honda had an expired registration, insurance, and inspection; (3) Appellant had a New York license and the passenger had a Pennsylvania identification; (4) the Honda was registered to someone in Pennsylvania; (5) the Honda was "a third-party car" with a "new tag;" (6) Appellant was not able to identify the owner of the Honda; and (7) Appellant did not identify his specific destination in Philadelphia.  *See* Ex. 1, Part 1 at 7:20-8:20; *see also* N.T. at 46.  Throughout his conversation with Officer Bailey, Officer Mathew stated that he wanted to call the El Paso Intelligence Center (EPIC) to conduct background checks and obtain consent to search the Honda.  *See* Ex.1, Part 1 at 7:20-8:20.

Officer Mathew then asked Officer Bailey to have a conversation with Appellant and the passenger.  *See* N.T. at 48; Ex. 1, Part 1 at 8:40-8:50.  At

---

[4] The record did not conclusively establish when Officer Mathew requested backup or a K-9 officer to respond to the scene.  However, as discussed further, a second officer responded to the scene approximately six minutes after the initial stop, and Detective Matthew Tobie responded to the scene twenty-six minutes after the initial stop.

[5] Officer Bailey's first name is not apparent in the record.

the suppression hearing, Officer Mathew explained that although he found some "indicators" of drug trafficking, Officer Bailey was more experienced and might "pick[] up on any other indicators." N.T. at 48.

Officer Bailey approached the Honda on the passenger side and interacted with the occupants through the front passenger side window.[6] *See* Ex. 1, Part 1 at 9:10-10:30. Meanwhile, Officer Mathew, who was still in his vehicle, reported his suspicions by phone to another unidentified officer.

Officer Bailey walked back to Officer Mathew's vehicle and stated that there was a "single key too" and that one of occupants was "shaking his knee." *Id.* at 10:50. Officer Mathew relayed the fact that there was only a single ignition key for the Honda over the phone.[7] *Id.* at 10:55.

Approximately thirteen minutes after initiating the traffic stop, Officer Mathew exited his vehicle to separate the occupants of the Honda. Ex. 1, Part 1 at 14:00-14:30. Officer Mathew walked up to the driver's window of the Honda, began talking to Appellant, and then asked Appellant to talk "outside." *Id.* at 14:30-14:40. Appellant exited the Honda, and Officer Mathew walked

---

[6] The dash cam recording did not capture the audio portions of Officer Bailey's interactions with the occupants of the Honda.

[7] During cross-examination of Officer Mathew at the suppression hearing, Appellant's counsel emphasized that the dash cam recording indicated that Officer Bailey made the first reference to a single key in the ignition. *See* N.T. at 49-51. At the suppression hearing, however, Officer Mathew testified that he noticed that there was a single key in the ignition when he approached the Honda. *Id.* at 15. The trial court credited Officer Mathew's suppression hearing testimony. *See* Order, 1/10/18, at 1-2. On appeal, Appellant does not dispute this finding.

Appellant back to the curb on the right side of the road by Officer Mathew's vehicle. Officer Mathew asked the passenger to turn off the Honda.

While standing by Officer Mathew's police vehicle, Officer Mathew asked Appellant if he had any weapons on him and whether Appellant "minded" if the officer frisked him. *Id.* at 14:50-15:00. In response, Appellant raised his hands, and Officer Mathew frisked Appellant, while continuing to ask where in New York Appellant was coming from and why Appellant was driving to Pennsylvania. *Id.* at 15:00-15:25. During this exchange, Appellant indicated that he was coming from the Bronx to see his girlfriend, who lived at "Unruh and Tyson." *Id.* at 15:20.

After completing the frisk, Officer Mathew then asked Appellant to "hang tight" because the information for the Honda was coming back as expired. *Id.* at 15:25. Officer Mathew returned to his police vehicle, and Officer Bailey appeared to engage Appellant in further conversation outside the police vehicle. Officer Bailey and Appellant moved to the grassy area on the side of the roadway, beyond the view of the dash cam. *Id.* at 15:55.

Approximately fifteen minutes after stopping the Honda, Officer Mathew contacted EPIC and provided information regarding the Honda, Appellant, and the passenger. *See id.* at 16:15-24:25. Officer Mathew received information that there was an open investigation of Appellant. N.T. at 19. Officer Mathew's initial call to EPIC lasted approximately eight minutes. *See* Ex. 1, Part 1 at 16:15-24:25.

Officer Mathew then contacted a DEA agent, who was referred to as Agent Boyd. *Id.* at 25:15. Officer Mathew received information from Agent Boyd that the open case involved "the fact that [Appellant] was stopped a year ago in a car with a hidden compartment in it." N.T. at 22. According to Officer Mathew, the DEA agent believed that the open case involved a red Honda. *Id.* at 63-64; Ex. 1, Part 1 at 28:40-28:50. Officer Mathew stated that the DEA agent was not in the office and was relaying this information to Officer Mathew by memory. N.T. at 63-64.

While Officer Mathew was in contact with EPIC, Officer Bailey and a third officer, later identified as Sergeant Schwartz,[8] approached the right side of the Honda and appeared to interact with the passenger. *See* Ex. 1, Part 1 at 18:20-18:50. Sergeant Schwartz continued to interact with the passenger for approximately eight minutes. *Id.* at 18:50-26:00. Meanwhile, Officer Bailey intermittently walked back and forth between Officer Mathew's vehicle and the Honda. During this time, Officer Bailey also appeared to inspect the outside of the Honda, including the undercarriage and the wheel wells. *See id.*

Approximately twenty-six minutes after Appellant was initially stopped, a K-9 unit, led by Detective Tobie, arrived at the scene, and Detective Tobie began talking to Appellant. *See id.* at 27:15. At about the same time, Officer Bailey and Sergeant Schwartz walked back to the Honda. Officer Bailey opened the front passenger door, had the passenger exit the Honda, frisked

---

[8] The record does not reveal when Sergeant Schwartz arrived at the scene.

him, and directed the passenger walk back toward Officer Mathew's vehicle. *Id.* at 27:30.

After removing the passenger, Officer Bailey and Sergeant Schwartz briefly stood in the space between the open passenger door and the body of the Honda. While standing in that space, Officer Bailey leaned forward, peered into the interior the Honda using his flashlight, and then walked away and closed the passenger door. *Id.* at 27:40.

After closing the door, Officer Bailey then walked back to Officer Mathew's vehicle. *See id.* at 28:00. Officer Mathew told Officer Bailey that he received information regarding the open investigation for a hidden compartment. *See id.* at 28:00-28:50. Officer Bailey indicated that he was looking "down underneath" and saw loose screws. *See id.* at 28:00-28:50.

Meanwhile, Detective Tobie appeared to remain in a conversation with Appellant. *See id.* at 27:15-29:15. The detective asked Appellant "basic questions" such as "[w]here he was coming from, what he was doing, what he believed was in the [Honda,]" who owned the Honda, and where his girlfriend lived. N.T. at 79. Detective Tobie indicated to Appellant that he was going to conduct a K-9 search of the Honda and asked Appellant if the police could remove bags of food from the Honda. *Id.* at 81-82, 101-02. Appellant agreed. *See id.*

Sergeant Schwartz opened the rear passenger's side door of the Honda, went inside the Honda, and removed two plastic bags. Ex. 1, Part 1 at 29:15-29:40. The sergeant placed the bags on the ground and then closed the door.

*Id.* As Sergeant Schwartz was removing bags from the Honda, Officer Mathew and Detective Tobie walked farther into the grassy area along the side of the road and discussed the indicators leading to the stop. *See id.* During this conversation, Detective Tobie called Officer Bailey over to his location and asked Officer Bailey to move Appellant, the passenger, and the bags of food farther away from the Honda.

As Officer Mathew and Detective Tobie walked back toward the Honda, Detective Tobie asked whether anyone asked Appellant for consent. *Id.* at 31:15. Officer Mathew indicated that he was in contact with EPIC. *Id.* Detective Tobie, with Sergeant Schwartz and Officer Mathew off to his side, then approached Appellant. The officers were visible on the dash cam recording, but Appellant remained outside the view of the dash cam recorder. Detective Tobie asked if there was anything in the Honda, and then asked if Appellant minded if "these officers" searched the Honda. *Id.* at 31:30-31:50.

At the suppression hearing, Detective Tobie described his request for Appellant's consent as follows:

> I asked, I asked [Appellant], I said, if, if, if—"Are there drugs in the car that you are aware of?" He said, "No." I said: Can myself and the other officers on scene here search your vehicle, in so many words. I don't know verbatim what I said, but in so many words that's what I say on a consistent basis in these type of operations. He said, "Yes, that's fine." And that's when if you see on the video Sergeant Schwartz and Officer Bailey go over to the vehicle for the search.

N.T. at 82-83. Additionally, Detective Tobie stated that "I advised him that there was going to be a K-9 that I was going to utilize for the car, and in that

- 10 -

conversation was that the officers would search and my K-9 partner. There was dialogue with that." ***Id.*** at 83. Detective Tobie noted that the audio of the dash cam did not capture that discussion. ***Id.*** However, Detective Tobie testified that Appellant responded, "'Yes, that's fine.'" ***Id.*** Immediately afterwards, Sergeant Schwartz and Officer Bailey walked back to the Honda, opened the front doors and proceeded to enter and search the interior of the Honda for approximately three minutes. ***See*** Ex 1., Part 1 at 31:50-34:15; Ex 1, Part 2 at 0:00-0:15.

Detective Tobie then approached the Honda with his K-9 partner "Ozzy." Ex. 1, Part 2 at 0:15. Sergeant Schwartz and Officer Bailey exited the Honda, leaving the driver and front passenger doors open. ***Id.*** Detective Tobie walked Ozzy around the rear bumper of the car to the front passenger side of the Honda. Ozzy entered the Honda though the front passenger door and began scratching at the center console. ***Id.*** at 0:15 to 0:50; N.T. at 86. After Ozzy exited the Honda, Detective Tobie closed the front passenger door and walked Ozzy around the front of the Honda, at which time Ozzy scratched at the front bumper. ***See*** N.T. at 87. Ozzy then reentered the Honda through the driver's door and scratched at the center console. ***Id.*** at 1:00-1:10; N.T. at 87. Ozzy exited the Honda, and Detective Tobie informed the other officers that Ozzy indicated the presence of narcotics. Ex. 1, Part 2 at 1:20-1:50.

The trial court summarized the remaining facts as follows:

> [Appellant] was informed that Ozzy made a positive identification for the presence of narcotics. Given that the vehicle search was being conducted on a major roadway, law enforcement wanted to

- 11 -

remove the [Honda] to the Bensalem Township Police headquarters for safety purposes. Law enforcement then asked [Appellant] if they could remove the [Honda] to headquarters to conduct a more thorough search. [Appellant] consented. At this time, [Appellant] was not placed under arrest and was told he could wait in the lobby of police headquarters while a more thorough search of the [Honda] was being conducted. This further search revealed a concealed compartment within the center console containing a bag which held approximately 4.6 grams of heroin. [Appellant] was then placed under arrest.

While [Appellant] was being fingerprinted and processed, Officer [Christopher] Pennington of the Bensalem Township Police Department asked [Appellant] whether he was willing to provide a buccal DNA swab from the inside of his cheek. [Appellant] consented. [Appellant] then placed the swab into his mouth, swabbed the inside of his cheek, and returned the swab to Officer Pennington. [Appellant] also reviewed the packaging of the buccal swab where [Appellant] signed the packaging indicating his voluntary consent.

Incident to [Appellant]'s arrest, Bensalem police conducted a search of the [Appellant]'s person. This search revealed a key with a label indicating [an address on] Friendship Street, Philadelphia, PA.[] Detective Tobie asked [Appellant] about his residence as part of standard booking procedure. [Appellant] indicated that he lived at the Friendship Street address with his girlfriend. Detective Tobie then asked whether [Appellant] would consent to police searching the Friendship Street premises. [Appellant] declined consent.

Order at 3-4.[9] On July 16, 2017, the Commonwealth filed an information charging Appellant with possession with intent to deliver a controlled

_____

[9] As noted by the trial court, police officers also obtained a warrant to search the Friendship Street premises, and "recovered rubber bands commonly used to wrap narcotics, a .40 caliber magazine, United States currency, mail in the name of . . . Appellant, and photographs of . . . Appellant" from the premises. Order at 5. For reasons not relevant to this appeal, the trial court suppressed the evidence recovered from the Friendship Street premises. *Id.* at 1.

substance, possession of drug paraphernalia, and possession of a controlled substance.

On August 7, 2017, Appellant filed an omnibus pretrial motion to suppress all of the evidence obtained after the traffic stop. Of relevance to this appeal, Appellant asserted that he was subjected to a series of unlawful seizures after the traffic stop, and that the police officers conducted illegal searches of the Honda. The trial court conducted a suppression hearing on November 15, 2017, at which Officer Mathew, Detective Tobie, and Officer Pennington, testified on behalf of the Commonwealth.[10] The parties also played the dash cam recordings.[11] Appellant testified, and his testimony focused on the taking of the buccal swab.

After receiving briefs from the parties, the trial court denied Appellant's motion as to the evidence recovered from the Honda and the taking of a buccal swab. Order at 1. As indicated above, the trial court granted Appellant's motion to suppress the evidence obtained from the search of the Friendship Street residence. *Id.*

Appellant proceeded to a stipulated bench trial. On March 14, 2018, the trial court found him guilty of all charges. That same day, the court sentenced

---

[10] The Commonwealth did not challenge Appellant's expectation of privacy in the Honda.

[11] The Commonwealth did not call Officer Bailey or Sergeant Schwartz as witnesses at the suppression hearing.

Appellant to six to twenty-three months' imprisonment for possession with intent to deliver, with no further penalty on the remaining counts.

Appellant timely appealed and filed a Pa.R.A.P. 1925(b) statement challenging the order denying his motion to suppress the evidence recovered from the Honda and the taking of a buccal swab. The trial court filed a responsive opinion. *See* Trial Ct. Op., 5/23/18, at 9-18.

Appellant presents the following questions for review:

[1]. Did the [trial] court err by failing to suppress the physical evidence found inside [the Honda] because the officer unreasonably expanded the scope and duration of an ordinary traffic stop by asking questions and making inquiries unrelated to the traffic violation without reasonable suspicion to believe that criminal activity was afoot?

[2]. Did the [trial] court err by failing to suppress the physical evidence found inside [the Honda] because the police unlawfully conducted a second detention and subsequent round of questioning, as well as a K-9 search of [the Honda], without reasonable suspicion to believe that criminal activity was afoot?

[3]. Did the [trial] court err by failing to suppress the physical evidence found inside [the Honda] because the police conducted a warrantless search of the interior of [the Honda] without probable cause and under no valid exception to the warrant requirement?

[4]. Did the [trial] court err by failing to suppress the DNA saliva sample extracted from [Appellant]'s mouth because the police did so without a warrant and under no valid exception to the warrant requirement?

Appellant's Brief at 4 (full capitalization omitted).

As suggested by his questions presented, Appellant argues that the trial court erred in denying his motion to suppress the heroin recovered from the

Honda and the buccal swab taken from him. *Id.* at 16-17. Appellant concedes that Officer Mathew lawfully stopped him for a traffic violation. *Id.* at 18. Appellant also acknowledges that he consented to the searches of the Honda and the taking of a buccal swab. *Id.* at 16-17.

Appellant, however, claims that his consent to the searches of the Honda and his person were not voluntary because he was subjected to a series of illegal seizures and searches following the initial traffic stop. *Id.* In support, Appellant claims that the trial court erred in finding reasonable suspicion to detain him beyond the purposes of the traffic stop. Appellant challenges several of the trial court's findings of fact and the trial court's legal conclusion that those facts constituted reasonable suspicion. *See id.* at 18-33. Additionally, Appellant challenges the trial court's determination that the police lawfully searched the Honda. *See id.* at 33-44. Lastly, he challenges the trial court's finding that he consented to the taking of a buccal swab. *See id.* at 44-47. We address each challenge in greater detail below.

Initially, we note that our standard and scope of review requires that we determine

> whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns

- 15 -

on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Green*, 168 A.3d 180, 183 (Pa. Super. 2017) (citation omitted).

### 1. The trial court's findings of fact

Appellant first challenges the trial court's findings of fact. *See* Appellant's Brief at 23-28. Specifically, Appellant claims that the record did not support the trial court's findings that he was unable to remember the name of the owner of the Honda and his girlfriend's address, or appeared nervous. *Id.* at 24-28. He contends that the record shows that Officer Mathew asked him a confusing series of questions and that his inability to answer the question of who owned the Honda was not indicative of criminal activity. *Id.* at 25. He also claims that the record indicates that when Officer Mathew asked about his girlfriend's address, he responded with an approximate location. *Id.* at 25-26. Lastly, he asserts that there were no indications on the dash cam recordings that he was nervous. *Id.* at 27.

Appellant also claims that the factors referenced by the trial court were not legally relevant to a determination of reasonable suspicion. *See id.* at 23-24 (discussing the presence of a single key), 24 (discussing the operation of a vehicle owned by a third party), 26 (asserting that a driver is under no obligation to answer questions unrelated to a traffic stop), 26-27

(characterizing travel from New York as impermissible profiling), 27 (asserting that "nervousness during a traffic stop is not a particularly telling factor"). Appellant emphasizes that the factors did not suggest he was engaged in criminal activity and were equally consistent with innocent behavior. *See id.*

The United States Supreme Court has outlined the following relevant principles:

> A seizure for a traffic violation justifies a police investigation of that violation. . . . [T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"— to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.
>
> . . . [A] traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket. . . . An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.
>
> Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

*Rodriguez v. United States*, 135 S. Ct. 1609, 1614-15 (2015) (citations omitted).

Therefore, to extend a traffic stop beyond the purposes of enforcing a traffic violation, there must be reasonable suspicion that a defendant "may have been engaged in criminal activity independent of" the traffic violation. **Green**, 168 A.3d at 184 (citation omitted). This Court has described the reasonable suspicion standard as follows:

> [T]o establish grounds for reasonable suspicion, the officer must articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. The question of whether reasonable suspicion existed at the time [an officer conducts the stop] must be answered by examining the totality of the circumstances to determine whether the officer who initiated the stop had a particularized and objective basis for suspecting the individual stopped. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of the [stop] warrant a man of reasonable caution in the belief that the action taken was appropriate.

**Id.** (citation omitted).

When assessing the totality of the circumstances, appellate courts have disapproved of a "divide-and-conquer" approach of considering individual factors in isolation from each other. **See Commonwealth v. Carter**, 105 A.3d 765, 772 (Pa. Super. 2014) (*en banc*) (discussing **United States v. Arvizu**, 534 U.S. 266, 274 (2002)). Moreover, it is well settled that

> [e]ven in a case where one could say that the conduct of a person is equally consistent with innocent activity, the suppression court is not foreclosed from concluding that reasonable suspicion nevertheless existed. In conducting a reasonable suspicion inquiry, a suppression court is required to afford due weight to the

specific, reasonable inferences drawn from the facts in light of the officer's experience.

**Commonwealth v. Stilo**, 138 A.3d 33, 39 (Pa. Super. 2016) (citations, quotation marks, and alterations omitted).

Here, the trial court stated:

In the instant case, once initiating the traffic stop, Officer [Mathew] developed reasonable suspicion that the Appellant was engaged in narcotics trafficking. First, upon approaching the [Honda], Officer [Mathew] observed a single key in the ignition which, based upon Officer [Mathew]'s training and experience, was an indication that the driver of the vehicle was engaged in the narcotics trade. Next, upon requesting registration information and asking Appellant about the ownership of the vehicle, an inquiry which specifically dealt with the purpose of the traffic stop, Appellant indicated the [Honda] was owned by a friend but that he could not remember his friend's name. Once receiving the [Honda]'s registration paperwork from Appellant, Officer [Mathew] noted the vehicle was registered to a third party who was not a passenger in the vehicle. Based upon his training and experience, Officer [Mathew] knew that drug traffickers will often operate and travel in vehicles which are registered to third parties. With these circumstances in mind, Officer [Mathew] then inquired into the origin and destination of . . . Appellant's trip. . . . Appellant, appearing nervous with his legs visibly shaking, indicated that he was traveling from New York on the way to see his girlfriend who lived in Philadelphia. Appellant's response revealed material information because based upon his training and experience, Officer [Mathew] knew that New York is a known narcotics source area and that the location of the traffic stop was along a known drug trafficking corridor.

Trial Ct. Op. at 9.

As to the trial court's findings that Appellant "could not remember" the name of the friend who owned the Honda, **see id.** at 9, Officer Mathew testified at the suppression hearing:

[W]hen I asked for his paperwork, for the car registration, the insurance, he provided me with a registration with a name which is not his name nor the driver's -- the passenger's name. Asked [Appellant] whose car it belonged to, and he said it was his friend's car. He couldn't tell me what his friend's name was right away and give me a right answer for it

N.T. at 16. Additionally, the dash cam video corroborated Officer Mathew's testimony. Ex. 1, Part 1 at 2:35-3:25. Although Appellant asserts that the trial court should not have weighed this factor against him, there was support in the record for the trial court's finding, and we find no basis to disturb the trial court's factual determinations regarding this evidence. **See Green**, 168 A.3d at 183.

As to the trial court's finding that Appellant was unable to provide his girlfriend's address, we note that the trial court did not discuss this factor in its order denying Appellant's suppression motion. **See** Order at 2, 5. However, in its Rule 1925(a) opinion, the trial court noted that Appellant "described a general area but could not provide a specific address." Trial Ct. Op. at 4. Later in the opinion, the trial court stated, "Appellant was unable to provide his girlfriend's address," when discussing reasonable suspicion to extend the duration of the traffic stop. **Id.** at 10.

Our review reveals that Officer Mathew testified as follows:

[Appellant] told me he was visiting a girlfriend in Philadelphia. I asked him where in Philadelphia. He just said the far Northeast. He wasn't sure. I believe he gave me an address of Tyson Avenue and Frankford, around that area, but he couldn't tell me exactly where he was going.

N.T. at 18-19; Ex. 1, Part 1 at 15:20. Therefore, we conclude that the record supported the trial court's finding that Appellant described the general area of his girlfriend's residence. **See Green**, 168 A.3d at 183. Moreover, the trial court's statement that Appellant was unable to provide an address was a reasonable characterization of the evidence.[12]

As to the trial court's determination that Appellant appeared nervous at the time of the initial traffic stop, we conclude that the record does **not** support this finding. Specifically, the trial court found that "Officer [Mathew] then inquired about the origin and destination of the [Appellant]'s trip. [Appellant], appearing nervous with his legs visibly shaking, stated that he was from New York on the way to see his girlfriend who lived in Philadelphia." Order at 2; Trial Ct. Op. at 2.

Officer Mathew, however, did not testify that Appellant appeared nervous during the initial traffic stop. **See** N.T. at 16-19. Further, the dash cam recording reveals that the officer did not list nervousness as a factor when initially reporting his suspicions to Officer Bailey. **See** Ex. 1, Part 1 at 7:20-8:20.

---

[12] We note that the dash cam recording suggests that Officer Mathew asked questions regarding Appellant's girlfriend's specific address after the officer approached the Honda for a second time and had Appellant exit the vehicle. **See** Ex. 1, Part 1 at 14:00-14:40. This interaction occurred approximately nine minutes after Officer Mathew first approached the Honda for the traffic stop. However, Appellant argues this issue in terms of Officer Mathew's initial decision to detain Appellant for a drug investigation. **See** Appellant's Brief at 18, 24-26.

Rather, Officer Mathew first testified that Appellant appeared nervous when the officer described his "re-approach" of the Honda at the suppression hearing. **See** N.T. at 24. Specifically, Officer Mathew testified:

> I re-approached the vehicle, talked to [Appellant, and] asked him for his information for his suspension for his insurance. The more . . . conversation I had with him, he just appeared to be more nervous. He started shaking his leg a lot, just really nervous demeanor, and he started stuttering a little bit on his words, which is when I had a conversation with him to step out of the car.

**Id.** The dash cam recording shows that this conversation occurred approximately nine minutes **after** Officer Mathew ended his first "approach" of the Honda for the traffic stop, and nearly five minutes after a second officer, Officer Bailey, engaged the occupants of the Honda. **See** Ex. 1, Part 1, at 14:00-14:40.

Therefore, the trial court's discussion of nervousness as a factor in the detention of Appellant beyond the scope of the initial traffic stop lacked proper support in the record. **See Green**, 168 A.3d at 183. Accordingly, we are not bound by this finding.[13] **See id.**

Regarding Appellant's several legal arguments in support of his first claim, we conclude that Appellant attempts a "divide-and-conquer" approach

---

[13] We acknowledge that Appellant did not identify this precise issue when arguing that the record did not support the trial court's finding that he appeared nervous. **See** Appellant's Brief at 27-28 (indicating that the trial court's conclusion was "not necessarily supported by [Appellant's] appearance in the dash cam video" and arguing that "nervousness during a traffic stop is not a particularly telling factor"). Nevertheless, our standard of review requires this Court to determine whether the trial court's findings of fact are supported by the record. **See Green**, 168 A.3d at 183.

as to the legal relevance of each factor discussed by the trial court. *See* Appellant's Brief at 23-27. However, this Court has long rejected such legal arguments. *See Stilo*, 138 A.3d at 39; *Carter*, 105 A.3d at 772. In any event, because Appellant also contends that the trial court erred in finding reasonable suspicion under the totality of the circumstances, we will address that contention further in conjunction with his next claim.

**2. The trial court's conclusion that reasonable suspicion existed**

Appellant next contends that the totality of the circumstances did not support the decisions to prolong the traffic stop and conduct a canine search. Appellant relies on *Commonwealth v. Dales*, 820 A.2d 807 (Pa. Super. 2003), to argue that Officer Mathew did not state a proper basis to believe Appellant was involved in criminal activity. Appellant's Brief at 30-32.

In *Dales*, a police officer stopped a driver for excessive window tinting. *See Dales*, 820 A.2d at 809. During the traffic stop, the officer observed several air fresheners hanging from the rearview mirror. *Id.* at 810. The officer also smelled a "mediciney" odor that suggested the presence of a chemical, such as Bactine, or a "masking scent." *Id.*

The driver in *Dales* was nervous when responding to the officer's questions about his travels. *Id.* The driver told the officer he went to New York and was returning home when he was stopped. *Id.* The officer obtained the driver's license, registration, and proof of insurance, returned to his patrol vehicle, and determined that the paperwork for the driver and the vehicle was

valid. *Id.* The officer returned to the driver's vehicle and asked the driver to walk back to the officer's police vehicle. *Id.* The driver complied. Once at the officer's vehicle, the officer used his own vehicle to demonstrate the permissible level of window tinting. *Id.* At some point in this interaction, the officer returned the paperwork to the driver. *Id.* at 809, 814 n.3.

While the driver and the officer were standing by the police vehicle, a plainclothes detective arrived at the scene. *Id.* at 810. The officer continued to ask the driver questions about his activities in New York. *Id.* at 811. During this conversation, the driver made statements inconsistent with responses he gave during the initial traffic stop. *Id.*

The officer continued to ask the driver whether there was anything illegal in the car, and the driver responded, "No." *Id.* The officer then asked for the driver's permission to search the vehicle, and the driver responded, "Yes." *Id.* The officer then removed the key from the driver's vehicle, opened the trunk, and saw two backpacks. *Id.* The officer opened one of the bags and discovered a package of what appeared to be a large quantity of cocaine. *Id.*

The trial court in *Dales* suppressed the cocaine, and the Commonwealth appealed. *Id.* This Court concluded that the driver was detained throughout the traffic stop and the interaction by the police vehicle. *Id.* at 812 & n.1. The *Dales* Court affirmed the order suppressing the evidence, reasoning that the smell of Bactine, the presence of several air fresheners, and the driver's nervousness did not establish reasonable suspicion to justify the continued

detention of the driver under the circumstances of that case. *Id.* at 815. The *Dales* Court refused to consider the driver's inconsistent responses about his activities in New York because the officer elicited them after the initial traffic stop had ended. *Id.* at 814-15.

In *Commonwealth v. Rogers*, 849 A.2d 1185 (Pa. 2004), a Pennsylvania State Trooper stopped a vehicle on a major highway for speeding and an expired out-of-state temporary registration plate. *Rogers*, 849 A.2d at 1187. The driver and sole occupant of the vehicle, the defendant, appeared "extremely nervous" and was trembling so severely that he had difficulty producing the paperwork requested by the trooper. *Id.* The defendant asserted that he recently purchased the vehicle in Tennessee, but was on the way back to Tennessee to return the vehicle to the seller. *Id.*

The defendant in *Rogers* gave the trooper paperwork that contained several omissions and falsehoods. *Id.* at 1188. When the trooper asked the defendant about his specific travel plans, the defendant stated he had left a friend's house, the address of which he could not remember. *Id.*

During this interaction, the trooper observed several open boxes of laundry detergent and fabric softeners in the backseat. *Id.* When the trooper asked to search the vehicle, the defendant refused and stated that he did not have an opportunity to search the vehicle himself or check the door panels and air vents. *Id.* The trooper then conducted a criminal records check on the defendant and discovered he had a prior drug conviction. *Id.* The trooper then detained the defendant for a canine search. *Id.*

During the ensuing canine search, the canine signaled a positive alert at the front door, and then jumped into the vehicle and alerted at the right rear of the vehicle. *Id.* Police ultimately recovered fifty-two pounds of marijuana from the vehicle. *Id.*

The trial court in *Rogers* suppressed the evidence concluding that there was no reasonable suspicion to detain the defendant or to conduct a canine search. *Id.* at 1188-89. This Court reversed, and the Pennsylvania Supreme Court granted allowance of appeal and affirmed this Court's decision. *Id.* at 1189, 1192.

The Pennsylvania Supreme Court, in *Rogers*, analyzed the issue of reasonable suspicion as follows:

> In the matter *sub judice*, [the trooper] stated that when he approached the vehicle, [the defendant] was extremely nervous. In fact, [the defendant] was trembling so badly he had difficulty retrieving his license from his wallet. Also, the paperwork for [the defendant]'s car was conflicting, incomplete and in some instances plainly fraudulent. Furthermore, while [the defendant] claimed that he had just departed a friend's house in Butler, he could not recall the address. Additionally, [the trooper] noted open boxes of laundry supplies as well as packaging tape in the back seat of the car; [the trooper] knew from his experience investigating drug offenses that these items were commonly used in the packaging and distribution of controlled substances.
>
> Of course, one can conceive of innocent explanations for each one of these facts. Yet, as noted *supra*, reasonable suspicion does not require that the activity in question must be unquestionably criminal before an officer may investigate further. Rather, the test is what it purports to be—it requires a **suspicion** of criminal conduct that is reasonable based upon the facts of the matter. The facts of the matter *sub judice* give rise to just such a suspicion. Appellant was unusually agitated; the paperwork for his vehicle was out of order in several key respects; his answers

regarding the location he had just departed were vague; and, most importantly, the back seat of his car contained products that [the trooper] knew, via his extensive professional experience, are commonly used in the packaging of illegal narcotics. These facts, taken in their totality, lead to a conclusion that [the trooper] had reasonable suspicion to suspect that criminal activity was afoot.

*Id.* at 1189-90 (citations and footnote omitted) (emphasis in original).

In *Green*, a Pennsylvania State Police trooper, who was assigned to a K-9 unit and with his canine partner, stopped the defendant for a speeding violation. *Green*, 168 A.3d at 181. When the trooper approached the vehicle, the defendant appeared overly nervous for a traffic stop. *Id.* at 181-82.

The trooper in *Green* recognized both the defendant and the vehicle from prior stops. *Id.* at 182. Approximately three months earlier, the trooper stopped the vehicle, which was being operated by the owner at the time, and found a hypodermic needle during the stop. *Id.* On another occasion, the trooper stopped the vehicle, in which the defendant was an occupant, and found cocaine and marijuana hidden in the engine compartment. *Id.*

The trooper then asked the defendant for the registration and insurance for the vehicle. *Id.* The defendant responded that he did not own the vehicle and it was not registered to him. *Id.* The trooper asked the defendant about his travel plans, and the defendant responded that he was returning from Philadelphia after dropping off his son. *Id.* The trooper returned to his police vehicle and conducted a criminal history check on the defendant. *Id.* The check revealed that the defendant had a history of assault and drug offenses. *Id.*

The trooper called for backup and then returned to the defendant and asked the defendant to exit the vehicle. *Id.* The trooper requested the defendant's consent to search the vehicle, but the defendant refused. *Id.* The trooper then conducted a canine search around the exterior of the car and the canine alerted to the presence of narcotics. *Id.* The trooper then searched the vehicle and discovered numerous packets of heroin. *Id.*

In the defendant's appeal, the *Green* Court distinguished *Dales* by noting that the totality of the circumstances provided the trooper with reasonable suspicion that the defendant was trafficking drugs. *Id.* at 185. Specifically the *Green* Court observed:

> When [the trooper] approached the vehicle and made contact with [the defendant], he immediately noticed that [the defendant] was "overly nervous just for being stopped for a traffic violation," as [the defendant]'s carotid artery was pulsating and "his lips and face area around his lips were trembling." Upon reviewing the vehicle's documentation, [the trooper] discovered that the vehicle belonged to an absent third party, which, in his experience, raised his suspicion that the vehicle was being used for drug trafficking. In addition, [the defendant] stated that he was returning from Philadelphia, a city known to [the trooper] as a source location for narcotics. [The trooper] also performed a criminal background check on [the defendant], which showed "a lengthy criminal history for . . . assault and drug offenses." Further, when [the trooper] stopped the vehicle, he remembered prior contacts with [the defendant] and with the subject vehicle. [The trooper]'s prior contact with [the defendant], where [the defendant] was a passenger in a vehicle stopped by [the trooper], resulted in recovery of cocaine and marijuana hidden in the engine compartment of the vehicle. [The trooper]'s prior contact with the [vehicle] resulted in recovery of a hypodermic needle in the passenger compartment.

*Id.* at 184-85.

Instantly, Officer Mathew testified about his initial interaction with Appellant as follows:

So as I approached the vehicle, I approached from the passenger's side of the vehicle. He had the window rolled down. And I made contact with the passenger and then the driver. Right away I noticed the fact that the ignition only had one single key in it. It just started my suspicion from my training. I observed multiple signs of criminal activity, especially for drug trafficking. First, since I noticed that, I kept that in mind with the single key, which means there's no personal keys on it, no house keys, no personal key chain, just a single key. The reason for that being most of my training and from my experience, what it is is you transport a car from point A to point B, and if it's involved in any kind of narcotics related, especially for drug trafficking, they pick the car up at one point, drive to the next point. That way they don't have any kind of personal information or any kind of connection with that car, the driver.

Second of all, when I asked for his paperwork, for the car registration, the insurance, he provided me with a registration with a name which is not his name nor the driver's -- the passenger's name. Asked the driver whose car it belonged to, and he said it was his friend's car. He couldn't tell me what his friend's name was right away and give me a right answer for it. Who is your friend? Where is he from?

\* \* \*

Like I said, that was another part of the course I did. That was another sign that the car was being used for some kind of drug trafficking. Because normally what they do is the registered owner will not be anything -- anybody from that car. It's going to be a third party owner, which is why -- what they use to keep a distance from that car. So normally when I ask the driver or the passenger whose car it is: Hey, this is my friend's car, but I'm just driving it. And I believe when I asked [Appellant] whose car it was, he said it was his friend's car, and he just normally lets me drive the car. That [was] what his answer to that question was.

\* \* \*

When I asked for his I.D., [Appellant] provided me with a New York license, and the car was registered in Pennsylvania. And the

- 29 -

passenger provided me with a Pennsylvania driver's I.D., I believe. Another -- with the indicators for that, it's sent from New York. New York is a pretty popular hub for drug, drug trafficking and coming to Philadelphia. Being working in Philadelphia, we had a lot of common information that people will be transporting drugs from New York to Philadelphia, and it's a very common thing at that time. So he provided me with a New York driver's license, car he said was -- belonged to his friend. And that was how the whole procedure for that went for his being -- saying it's his friend's car, I'm just driving it, and had no other information on that.

N.T. at 15-18.

The trial court concluded that Officer Mathew possessed reasonable suspicion. The trial court reasoned:

While we recognize that each of the foregoing facts may seem innocuous when evaluated individually . . . reasonable suspicion **does not** require that the activity in question be incontrovertibly criminal. Rather, the standard requires that an officer's reasonable suspicion of criminal conduct be based upon a **holistic** evaluation of the facts at hand. Over the course of his investigation concerning the [Honda]'s expired registration, Officer [Mathew] observed that Appellant was operating a vehicle with a single key in the ignition, Appellant could not identify the owner of the [Honda] whom he claimed was his friend, Appellant was unable to provide his girlfriend's address, Appellant was traveling from a known narcotics source area, and the traffic stop was initiated on a common drug trafficking corridor. These facts, evaluated in their totality, lead to a conclusion that Officer [Mathew] had reasonable suspicion to suspect that criminal activity was afoot. There is no evidence contained in the record to suggest that Officer [Mathew] extended his interactions with Appellant beyond exploring the reasonable suspicion which arose as a direct consequence of the traffic stop. Law enforcement never terminated the initial traffic stop by telling Appellant he was free to leave only to reengage the Appellant later on. The entire investigatory episode between the initial traffic stop and Appellant's eventual arrest was a continuous sequence of events. Thus, Officer [Mathew] did not unreasonably or unlawfully prolong the traffic stop.

Trial Ct. Op. at 9-10 (citations omitted) (emphases in original).

Following our review, we discern no error in the trial court's conclusion that Officer Mathew testified to specific and articulable facts giving rise to a reasonable suspicion that Appellant was involved in criminal activity. Officer Mathew testified to his concern regarding the single key in the ignition, as well as the third-party ownership of the Honda, and specifically linked those facts to his training. As Officer Mathew noted, Appellant was operating a vehicle bearing a Pennsylvania license plate despite asserting that he was driving from his home in New York to Philadelphia. The trial court was entitled to find that Appellant did not identify the owner of the Honda despite his assertion that the owner was his friend. Additionally, the trial court's finding that Appellant was unable to provide a specific address for his girlfriend was supported by the record.

Moreover, although this case shares some similarities with **Dales**, we conclude that **Dales** is not controlling. The trial court properly viewed the totality of the circumstances and afforded due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience. **See Stilo**, 138 A.3d at 39; **Carter**, 105 A.3d at 772. Accordingly, finding no abuse of discretion or error of law, we conclude that the trial court properly

determined that there was a reasonable suspicion justifying Appellant's detention beyond the necessities of the initial traffic stop.[14]

### 3. The search of the Honda

Appellant next claims that the police conducted unlawful searches that did not fall under any valid exception to the warrant requirement. *See* Appellant's Brief at 33-44. Appellant's argument proceeds in several parts. Initially, Appellant contends that during the narcotics investigation, Officer Bailey improperly leaned into the interior compartment of the Honda and observed missing or loose screws around the center console. *Id.* Appellant asserts that Officer Bailey's intrusion into the interior of the Honda, constituted a search that required probable cause. *Id.* (citing *United States v. Montes-Ramos*, 347 Fed. Appx. 383 (10th Cir. 2009) (unpublished order), and *United States v. Ryles*, 988 F.2d 13 (5th Cir. 1993)).

---

[14] Appellant further contests the trial court's finding that Officer Mathew obtained information that Appellant was a "known narcotics trafficker." Appellant's Brief at 32-33; *see* Trial Ct. Op. at 13. We note that Officer Mathew testified that he received information from EPIC and the DEA agent that there was an open case on Appellant and that he was known to drive a Honda with a hidden compartment. *See* N.T. at 22. While the record did not necessarily support the trial court's use of the term "known drug trafficker," the trial court was entitled to consider that Appellant was known to operate a vehicle containing a hidden compartment.

In any event, Officer Mathew did not receive this information until after he decided to initiate a criminal investigation. *See* Ex. 1, Part 1 at 25:15; N.T. at 22. Therefore, it was not relevant to the trial court's determination that Officer Mathew had reasonable suspicion to extend the traffic stop.

Appellant also contends that the trial court erred in finding that his consent to a K-9 search was valid under the circumstances. Appellant's Brief at 34-35. Appellant notes that at the time he gave his consent, there were numerous uniformed police officers at the scene, he was frisked and ordered to remain outside of the car, and Officer Mathew retained the paperwork that Appellant had passed to the officer. *Id.* at 37. Appellant further notes that despite speaking with "a heavy Spanish accent," officers did not take steps to ensure that he understood that he had a right to refuse consent to the search. *Id.* at 38. Appellant emphasizes that the officers failed to use a "standard consent form to ensure an informed and voluntary consent." *Id.*

Appellant continues:

At no point did any law enforcement officer explain to [Appellant] that he had the right to leave or the right to refuse to grant consent. Indeed, it did not appear [Appellant] had any real choice in the matter since the K-9 search appeared imminent regardless of what he said. This was evident by the fact that the police had previously removed bags of food from the rear seat in preparation for the ensuing dog sniff prior to requesting consent to search. ***See***[] ***Commonwealth v. Pichel***, 323 A.2d 113 (Pa. Super. 1974) (consent can hardly be said to be voluntary if given where a search by police appears inevitable).

*Id.* at 37. Given these circumstances, Appellant likens this case to ***Commonwealth v. Acosta***, 815 A.2d 1078 (Pa. Super. 2003) (*en banc*).

Lastly, Appellant contends that if his consent to the K-9 search was invalid, then the conduct of the K-9 search cannot be excused. Appellant's Brief at 40. Specifically, Appellant contends that Detective Tobie improperly

permitted his canine to enter the Honda rather than having Ozzy sweep the exterior of the vehicle. *Id.* at 40-41.

### A. Officer Bailey's observation of loose screws

As to Appellant's claim that Officer Bailey entered the vehicle, we note that the trial court determined that "Officer Bailey, while standing outside the vehicle, observed loose screws in the center console area." Order at 2. The court further concluded that "Officer Bailey's observation of loose screws in the center console area was not an illegal search. Officer Bailey's observation falls under the plain view exception to the warrant requirement." *Id.* at 5. In a footnote to its opinion, the trial court further explained:

> The record, however, indicates that Officer Bailey did not protrude into any concealed or private area of the vehicle. He merely stood closely to the doorway while standing on the side of the road. We therefore find that Officer Bailey did not conduct a "search" of the vehicle when he made a plain view observation that the center console contained loose screws.

Trial Ct. Op. at 14 n.9.

Following our review of the record, including a review of the dash cam recording, we find support for the trial court's determination that Officer Bailey did not intrude into a private area of the vehicle. *See* Ex. 1, Part 1 at 27:30-27:40. Therefore, Appellant's factual assertion that Officer Bailey entered the vehicle fails, and we need not consider Appellant's legal argument that Officer Bailey's action constituted a search requiring probable cause.

### B. Appellant's consent to the searches of the Honda

As to Appellant's argument that his consent was involuntary under the totality of the circumstances, the following principles guide our review:

> In determining the validity of a given consent, the Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances. The standard for measuring the scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange between the officer and the person who gave the consent. Such evaluation includes an objective examination of the maturity, sophistication and mental or emotional state of the defendant. . . . Gauging the scope of a defendant's consent is an inherent and necessary part of the process of determining, on the totality of the circumstances presented, whether the consent is objectively valid, or instead the product of coercion, deceit, or misrepresentation.

***Commonwealth v. Smith***, 77 A.3d 562, 573 (Pa. 2013) (citations and quotation marks omitted).

Other factors relevant to a determination of the validity of a consent to search include:

> 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including the degree of coerciveness; 8) whether the person has been told that he is free to leave; and 9) whether the citizen has been informed that he is not required to consent to the search.

***Commonwealth v. Powell***, 994 A.2d 1096, 1102 (Pa. Super. 2010) (citation omitted).

The fact that an officer advises a defendant of his right to refuse a search may be a significant factor in determining whether a defendant's consent was voluntarily given. *See Acosta*, 815 A.2d at 1087. Nevertheless,

> there is no requirement that a police officer advise a person that he or she may refuse consent to be searched. Unless the totality of factors indicate that the consent was the product of express or implied duress or coercion, the mere fact that a police officer did not specifically inform an appellant that he or she could refuse the request will not in and of itself result in a determination that the subsequent search was involuntary.

*Commonwealth v. Moultrie*, 870 A.2d 352, 360 (Pa. Super. 2005) (citation and emphasis omitted).

In *Acosta*, this Court adopted the following summary of the circumstances surrounding the defendant's consent to a search:

> Officer Monaghan then informed [the driver] that the police were having trouble with drug trafficking on that highway. He asked [the driver] whether he had any weapons or narcotics in the vehicle. When [the driver] said "no," Officer Monaghan asked [the driver] whether he would allow him to search the vehicle.
>
> Although [the driver] acquiesced in the officer's request, that request was made while the officer retained the registration, insurance card, and the ID card. The officer never indicated in any way that [the driver] was free to leave before he requested consent. The officer acknowledged that he was not certain whether he would have permitted [the driver] to leave the scene had he attempted to do so. Furthermore, the entire conversation was in English.[15]
>
> When the consent was requested, [the driver] was standing in front of one of three police vehicles on the scene with their overhead lights activated. Additionally, three officers—Officer

---

[15] In *Acosta*, there was conflicting evidence regarding the driver's fluency in English. *See Acosta*, 815 A.2d at 1085 n. 4.

Monaghan and Officer Hart and Officer Derek Goldstein—stood next to each other in close proximity to [the driver] when consent was requested. [The driver] was not provided with any consent forms advising him that he had a right not to consent and he did not give a written consent. In short, he was never advised in any way that he was free not to consent to the search.

*Acosta*, 815 A.2d at 1081. The officers eventually discovered drugs in the car and arrested the driver. The trial court concluded that "the consent was not the product of an essentially free and unconstrained choice and was thus involuntary." *See id.* at 1082.

In the Commonwealth's appeal, an *en banc* panel of this Court affirmed the trial court's ruling. The *Acosta* Court reasoned:

In the instant case, based upon its factual findings and under the totality of the circumstances, the trial court determined that [the driver] did not voluntarily consent to the search. . . .

\* \* \*

Based upon the above factual findings, the trial court found that the following coercive factors were present when Monaghan requested [the driver]'s consent for the search: (1) the existence of a prior, lawful detention; (2) the withholding of [the driver]'s vehicular documentation; (3) the presence of other officers and marked police cars with flashing lights in close proximity to [the driver]; and (4) the absence of an express endpoint to the detention in the form of an admonition by the authorities that Acosta was free to leave.[] Each of these factors, standing alone, may not be sufficient to establish coercion. However, the presence of all of these factors, under the totality of the circumstances, lead us to conclude that [the driver]'s consent was not "the product of an essentially free and unconstrained choice [,]" but was "the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances." The evidence supports the trial court's finding that Acosta's consent was not "voluntary".

*Id.* at 1084-86 (citations and footnote omitted).

In **Commonwealth v. Rosas**, 875 A.2d 341 (Pa. Super. 2005), a Pennsylvania State Trooper stopped a vehicle for speeding. **Rosas**, 875 A.2d at 344. When the trooper requested paperwork from the defendant-driver,[16] he was unable to produce a driver's license, proof of insurance, or registration. **Id.** The defendant did give the trooper a social security card and told the trooper his date of birth. **Id.** The defendant also told the trooper the town he lived in, but was unable to provide a specific address. **Id.** The trooper conducted a check of the defendant's information through the National Crime Information Center and obtained information that the defendant could be a felon who was previously deported. **Id.** Additionally, the trooper obtained information that the vehicle was registered to a female in West Virginia. **Id.** at 344-45. After receiving the information, the trooper called for backup, and a second trooper arrived at the scene. **Id.** at 345.

The trooper in **Rosas** order the defendant to exit the vehicle, placed him in handcuffs, and had him stand between the trooper's vehicle and the vehicle that the defendant was driving. **Id.** The trooper noticed a license plate inside the vehicle and asked the defendant "whether he could enter the vehicle and 'retrieve' the license plate." **Id.** The defendant consented, responding, "[N]o problem." **Id.** at 345, 349.

The second trooper then went to the passenger side door, tilted the passenger seat forward and began reaching for the license plate. **Id.** at 345.

_____

[16] There was one passenger in the vehicle.

- 38 -

The second trooper stated he had to "move stuff" to reach the license plate and in so doing, observed a little plastic bag containing what appeared to be cocaine. *Id.* Following the discovery of the little plastic bag, the troopers arrested the defendant.[17] *Id.*

The trial court in *Rosas* granted the defendant's motion to suppress the fruits of the search of the vehicle, concluding, in part, that the trooper obtained the defendant's consent following an illegal arrest. *Id.* The Commonwealth appealed, and this Court reversed the trial court.

The *Rosas* Court reasoned that the defendant was not under arrest when the trooper asked him for consent to enter the vehicle, and that there was a sufficient basis to detain the defendant. *Id.* at 347-48. Of relevance to this appeal, the *Rosas* Court concluded that the defendant's consent was valid under the totality of the circumstances. *Id.* at 350. The Court specifically refused to create a presumption that the defendant's consent was rendered involuntary based on the fact the defendant was handcuffed in the presence of the troopers. *Id.*

Instantly, the trial court concluded that Appellant's consent was voluntarily given. Order at 5. Specifically, the trial court found that

> Detective Tobie and other supporting officers spoke with [Appellant] who gave consent for the officers to remove the bags of food located in the back seat prior to any search. After the bags were removed from the vehicle's interior cabin, Detective Tobie asked [Appellant] for permission to search the vehicle for drugs.

---

[17] The passenger was also arrested and charged as a co-defendant.

[Appellant] consented.  At the time, [Appellant] was standing on the shoulder of the road.

*Id.* at 3.

In its Rule 1925(a) opinion, the trial court further explained that

we find no evidence that law enforcement undermined Appellant's voluntary consent to the search of his vehicle.  First, there was no excessive or overwhelming police presence.  Dash cam footage of the traffic stop indicated a handful of law enforcement officers present at the scene of the traffic stop.  Second, no physical contact occurred between Appellant and law enforcement.  Law enforcement did not restrain or impose any physical force upon Appellant during the course of the traffic stop and the subsequent investigatory detention.  Appellant was not in custody and remained freely standing on the side of the road while law enforcement and Appellant maintained a cordial tone throughout the course of the investigation.  Third, law enforcement did not direct Appellant's movement beyond asking the Appellant to step out of his vehicle and transporting him to police headquarters for safety purposes, for which Appellant consented.  Fourth, with respect to law enforcement's demeanor, the police maintained a polite and conversational tone throughout the entire investigation.  Fifth, we find that the time and place of the traffic stop did not have any dispositive impact on whether Appellant voluntarily consented to the search of the vehicle. . . .

With respect to the sixth factor, the content of the questions and statements, the police engaged in standard questioning of the Appellant.  At the traffic stop, Officer [Mathew] asked either generic biographical information of Appellant or questions relating to the expired registration.  Detective Tobie did the same prior to initiating the canine search.  It was only after the Appellant could not remember the name of the vehicle's owner combined with the other plain view observations that either Officer [Mathew] or other law enforcement officers made at the scene, that Officer [Mathew] cultivated reasonable suspicion of narcotics trafficking.

Seventh, the character of the initial investigative detention was polite and unremarkable.  Appellant's entire interaction with law enforcement was conversational and calm.  No member of law enforcement raised their voices at Appellant or exerted any physical control over Appellant.  There were no signs of duress or

use of any coercive tactics used by law enforcement as a means of inducing Appellant's consent to the vehicle search. Detective Tobie testified that his tone with Appellant was cordial. Moreover, Detective Tobie explicitly asked the Appellant whether law enforcement could conduct a search of his vehicle for drugs to which the Appellant immediately consented.

Eighth, the transition from the traffic stop to the investigatory detention was seamless. Officer [Mathew] gradually acquired reasonable suspicion that Appellant was engaged in narcotics trafficking. An immediate investigatory detention followed with a subsequent canine search. The time period between the initial traffic stop and Appellant's arrest was approximately a little over an hour. Finally, while we recognize that Appellant was never expressly told he was free to leave, we believe the totality of the circumstances in the instant case does not warrant a determination that such an omission nullifies Appellant's consent to the search.

Trial Ct. Op. at 15-16.

The trial court further noted that Detective Tobie did not inform Appellant of his right to refuse the search. *Id.* at 16-17. However, the trial court concluded that this factor did not outweigh the totality of the circumstances that Appellant's consent to a search of the Honda was voluntary. *Id.*

Following our review, we find no basis to disturb the trial court's findings of fact and conclusions of law. Although this case does share some similarities with *Acosta*, a review of the record supports the trial court's determination that Appellant's decision to consent was a free and unconstrained choice. *See Smith*, 77 A.3d at 573; *cf. Acosta*, 815 A.2d at 1084-86. As noted by the trial court, the officers' conduct was not coercive and Appellant did not show any signs of duress. *See Rosas*, 875 A.2d at 341. Furthermore, although

the officers did not inform Appellant of his right to refuse the search, we find no basis under the circumstances of this case to conclude that this fact was dispositive. *See Moultrie*, 870 A.2d at 360.

We acknowledge that there was a two-minute gap between the time Detective Tobie asked whether officers could remove the bags of food from the car and the detective's request that Appellant consent to a search of the interior of the vehicle. However, under the circumstances found by the trial court, which are supported by the record, we conclude that this gap in time did not amount to implied coercion that would negate Appellant's consent. Therefore, Appellant's argument that his consent was involuntary under the circumstances fails.[18]

### 4. Appellant's consent to the buccal swab

Lastly, Appellant claims that the trial court erred in concluding that his consent to the buccal swab was voluntary. Appellant argues:

> While Officer Pennington's request may not have been expressly coercive, the [trial] court did not consider the totality of other circumstances that existed to determine whether the defendant's consent was truly a product of an informed, free and unconstrained choice and not merely a submission to a claim of authority. Those circumstances include the fact that [Appellant] was in the police station under formal arrest and charged with a crime after the police recovered drugs from a hidden compartment, that the swabbing occurred during arrest processing that included fingerprinting and photographing which

---

[18] Because we conclude that Appellant's consent was voluntary, we need not address his last argument that if his consent was involuntary then the K-9 search would have been improper. *See* Appellant's Brief at 40-41.

[Appellant] was required by law to undergo, and that [Appellant] was never told that, unlike fingerprinting and photographing, he had the absolute right to refuse the swabbing of his mouth for DNA. *See*[] *Commonwealth v. Burgos*, 299 A.2d 34 (Pa. Super. 1972) (mere acquiescence in an order or request of the police can never be equated with consent).

Appellant's Brief at 45-46.

Appellant continues that

[i]n circumstances that can easily breed confusion such as where a person is undergoing arrest processing that requires him by law to submit to certain commands such as fingerprinting and photographing, special care should be taken to explain the distinction between that which the person is obligated to do by law and that which he is not to ensure that consent is truly voluntarily and not merely a confused submission to even courteous authority.

*Id.* at 46-47. Appellant concludes that "the Commonwealth upon whom rested the burden of proof failed to show by clear and convincing evidence that [Appellant]'s consent to the DNA swabbing was truly an informed act of free will and not simply a submission to authority." *Id.* at 47.

Instantly, the trial court addressed Appellant's claim as follows:

In the instant case, the evidence indicates Appellant voluntarily consented to providing law enforcement the buccal swab. Officer Pennington asked . . . Appellant, in a conversational tone, whether he would be willing to provide law enforcement with a buccal swab of the inside of his mouth. . . . Appellant agreed, swabbed the inside of his mouth himself, and returned the swab to Officer Pennington. After handing over the swab to Officer Pennington, . . . Appellant signed an acknowledgment on the swab's packaging indicating that Appellant was providing the swab voluntarily. While Appellant was handcuffed at the time of Officer Pennington's request, we do not find that such a circumstance invalidates Appellant's consent. At no point in the record did either Officer Pennington threaten or coerce Appellant into providing the swab.

- 43 -

He merely asked the Appellant in a casual and courteous manner whether Appellant would be willing to provide a buccal swab. Moreover, there is nothing in the record to indicate that Appellant suffered from any mental deficiencies or that his respective intelligence prevented him from understanding Officer Pennington's request. Throughout Appellant's entire interaction with law enforcement, Appellant never represented to any officer that he had any objection to providing the swab or that he had difficulty understanding Officer Pennington's inquiry. We therefore determine that no search warrant was required to obtain the buccal swab from the Appellant because Appellant voluntarily consented to providing law enforcement with the buccal swab sample.

Trial Ct. Op. at 18.

Having reviewed the record, the relevant law, and Appellant's arguments, we discern no merit to Appellant's claim that his consent to the DNA swab was involuntary. The trial court properly considered the totality of the circumstances surrounding Appellant's consent. *See Smith*, 77 A.3d at 573; *Powell*, 994 A.2d at 1102. The trial court's findings were supported by the record. *See Green*, 168 A.3d at 183. Although Appellant suggests that different inferences could be drawn from the facts, we discern no abuse of discretion or error of law in the conclusion that Appellant's consent to submit to a DNA swab was a free and unconstrained choice. *See Smith*, 77 A.3d at 573. Therefore, no relief is due.

As Appellant's challenges to the trial court's suppression rulings merit no relief, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/3/19