J-S08022-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| VINCENT JEROME CARROLL, SR. | : | |
| | : | |
| Appellant | : | No. 1104 MDA 2022 |

Appeal from the Judgment of Sentence Entered July 22, 2022
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0002803-2021

BEFORE:   OLSON, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY McCAFFERY, J.:                **FILED: JUNE 6, 2023**

Vincent Jerome Carroll, Sr. (Appellant), appeals from the judgment of
sentence imposed in the Dauphin County Court of Common Pleas following his
stipulated, non-jury convictions of firearms and drug offenses.  On appeal, he
challenges the trial court's denial of his motion to suppress evidence recovered
from a search of his vehicle.  Specifically, he contends the encounter was not
supported by reasonable suspicion or probable cause, his consent to search
the vehicle was invalid, and the warrantless search of his vehicle violated
***Commonwealth v. Alexander***, 243 A.3d 177 (Pa. 2020).  For the reasons
below, we affirm.

The trial court aptly summarized the relevant facts developed during the
suppression hearing as follows:

---

[*] Retired Senior Judge assigned to the Superior Court.

On April 24, 2021, Officer Patrick Walsh (hereinafter "Officer Walsh") and Detective Patrick Corkle (hereinafter "Detective Corkle") of the Swatara Township Police Department were members of the High Enforcement Action Team ("HEAT") monitoring several hotels in a high-crime, high-drug area within the municipality. Officer Walsh explained HEAT as plain-clothes detectives or officers monitoring a hotel and when they see something suspicious, will radio to one of the marked "stop" vehicles to conduct a traffic stop on a vehicle of interest.

Detective Corkle was parked in the Domino's parking lot on Eisenhower Boulevard conducting surveillance on the south end of the Howard Johnson parking lot. At some point, his attention was drawn to a black Ford Expedition that entered and parked in the Howard Johnson parking lot. The male driver, subsequently identified as [Appellant], exited the vehicle, walked to the sliding glass door of one of the hotel rooms (later determined to be Room 107) and was handed something from a female inside. Detective Corkle could not identify what the item was, but noted that it was a smaller item that fit in the palm of the female's hand.

At that point, Detective Corkle testified that he intended to have one of the marked "stop" vehicles use the dark tinted windows on [Appellant's] vehicle as a pretext to stop it as it left the Howard Johnson parking lot. Unfortunately, there were no marked "stop" vehicles available at that time. Approximately ten (10) minutes later, Detective Corkle observed the black Ford Expedition return to the Howard Johnson and park in a spot close to where it had parked previously. Again, [Appellant] exited the vehicle, walked to the sliding glass doors of Room 107 and handed something to the female inside. [Appellant] returned to the vehicle and backed out of the parking space. Detective Corkle testified that he again intended to stop the vehicle for the dark tinted windows as a pretext for a drug investigation.

Instead, the Ford Expedition did a U-turn before exiting onto Eisenhower Boulevard and pulled into and parked in the fire lane near Room 107. Detective Corkle continued to watch the vehicle and observed a silhouette of [Appellant] "reach into the backseat several times and pull a bag to his lap and eventually place[ ] the bag back into the backseat." Since it was toward the end of the HEAT detail, Detective Corkle determined there was enough to "blow it up" a/k/a expose the undercover officers and conduct a traffic stop of the vehicle in the parking lot.

Once he heard the command from Detective Corkle, Officer Walsh parked in the Lancaster Brewing Company parking lot and walked next door to the Howard Johnson where [Appellant's] vehicle was parked. As he was walking, Officer Walsh could see inside the front windshield of [Appellant's] vehicle[ and] made eye contact with [Appellant,] who immediately opened the center console and threw something inside. Officer Walsh knocked on [Appellant's] passenger side window and when [Appellant] rolled the window down, he immediately smelled the odor of marijuana. Based upon his observations of [Appellant] throwing something into the center console, the smell of marijuana and for officer safety, Officer Walsh asked [Appellant] to step out of the vehicle.[1]

Officer Walsh was wearing a body camera during this incident, and portions of it were played during the suppression hearing. . . . Once [Appellant get out of] the vehicle, there were at least two (2) police vehicles parked behind [Appellant's] vehicle and three (3) other officers standing outside. Officer Walsh immediately questioned [Appellant] about what he put in the center console. [Appellant] responded that it was a blunt and produced his [Pennsylvania] medical marijuana card. After a brief conversation about how long [Appellant] was staying at the Howard Johnson, Officer Walsh requested to see his license, which [Appellant] provided, as well as a temporary license for Kentucky where he recently moved.

While still in possession of [Appellant's] documents, Officer Walsh asked [Appellant] for consent to search his vehicle. [Appellant] granted the consent. During the entire interaction, an officer was standing to the left and behind [Appellant]. A search of the vehicle discovered an unsmoked marijuana blunt on the center console, and a partially smoked marijuana blunt inside the center console. Additionally, a Coach bookbag in the backseat was searched and a large amount of individually wrapped marijuana bags, clear plastic bags and a scale were found inside. The marijuana was not packaged consistently with medical marijuana sold in Pennsylvania.

---

[1] The officer later told Appellant that he was investigating a "noise violation," which was not truthful. *See* N.T., 2/17/22, at 34-35.

While [Appellant's] vehicle was being searched, other officers went to Room 107 and made contact with the female inside. They learned that Room 107 was rented to [Appellant] and his girlfriend. As soon as officers made contact, they smelled marijuana emanating from Room 107. At around 00:08:14 on the [body cam] video, Officer Walsh read [Appellant] his *Miranda*[2] rights and [said] that he [was] not under arrest, but detained as part of a drug investigation. Thereafter, [Appellant] informed Officer Walsh that he had his girlfriend's firearm on him. Officer Walsh removed it from [Appellant's] waistband.[3] After learning that [Appellant] was a person not to possess, Officer Walsh placed him under arrest.

Trial Ct. Op., 5/13/22, at 2-5 (record citations & footnote omitted).

Appellant was charged with persons not to possess a firearm, possession with intent to deliver a controlled substance (PWID), and possession of drug paraphernalia.[4] On September 1, 2021, Appellant filed a motion to suppress the physical evidence recovered during the search, asserting the police had no reasonable suspicion or probable cause to detain him, his consent to search the vehicle was invalid, and the subsequent warrantless search was violative of *Alexander*. *See* Appellant's Motion to Suppress Physical Evidence, 9/2/21, at 1-2 (unpaginated). The court conducted a suppression hearing on February

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] Appellant told the officer that his girlfriend had a gun license, and that he had intended to put the gun in their room before he was stopped. *See* Commonwealth's Exhibit 1 (Body Cam Footage) at 19:05-19:17; *see also* N.T., 7/22/22, at 16. Although Appellant did not testify at the suppression hearing, at the time of sentencing, the trial court indicated that it accepted Appellant's explanation for his possession of the firearm — *i.e.*, that he intended only to move it from the vehicle to the hotel room — at "face value[.]" *See* N.T., 7/22/22, at 29.

[4] 18 Pa.C.S. § 6105(a)(1); 35 P.S. § 780-113(a)(30), (32).

17, 2022, at which time the Commonwealth presented the testimony of Officer Walsh and Detective Corkle. Appellant did not present any evidence or testimony. After requesting post-hearing memoranda from both parties, the trial court entered an order on May 13, 2022, denying Appellant's motion to suppress. *See* Order, 5/13/22.

Appellant proceeded to a stipulated bench trial and sentencing hearing conducted on July 22, 2022. Although Appellant's counsel argued that the marijuana removed from the vehicle was for personal use,[5] and therefore, there was reasonable doubt as to the charges of PWID and possession of paraphernalia, the trial court disagreed, and convicted Appellant of all three charges. Appellant waived his right to a presentence investigation report and proceeded immediately to sentencing. *See* N.T., 7/22/22, at 11. After considering argument by Appellant's counsel, and Appellant's own statement, the trial court imposed a sentence of two to four years' imprisonment followed by four years' probation on the charge of persons not to possess firearms,[6]

_____

[5] After Appellant admitted to Officer Walsh that he put his "blunt" in the center console, he provided the officer with his Pennsylvania medical marijuana card. *See* Body Cam Footage at 1:00-1:34. He explained that he recently moved to Kentucky and was back in Pennsylvania for a friend's funeral. *See id.* Because marijuana use is not legalized in Kentucky, Appellant told the officer he wanted to "load up" before returning to Kentucky. *See id.* at 16:25-16:37. He insisted that he purchased the marijuana at a dispensary, and was told he should repackage it himself*. See id.* at 11:03-11:16, 15:25-16:11.

[6] The sentence imposed on the firearms offense fell below the mitigated range of the sentencing guidelines. *See* N.T., 7/22/22, at 12 (standard range was 72 to 90 months, with a mitigated range of 60 months).

and a concurrent term of one to two years' imprisonment on the charge of PWID. Appellant filed a post-sentence motion, which the trial court denied on July 28, 2022. This timely appeal follows.[7]

Appellant raises one issue on appeal:

> Whether the trial court erred by denying Appellant's pre-trial motion to suppress?

Appellant's Brief at 3 (some capitalization omitted).[8] Specifically, Appellant contends: (1) Officer Walsh had no reasonable suspicion to conduct an investigative detention when he ordered Appellant out of his vehicle; (2) Appellant's subsequent consent to the search of his vehicle was involuntary; and (3) the warrantless search of Appellant's vehicle was violative of ***Alexander***. ***See id.*** at 18-34. We conclude Appellant is entitled to no relief.

Our review of a trial court's denial of a suppression motion is guided by the following:

> [O]ur standard of review . . . is limited to determining whether the factual findings are supported by the record and whether the

---

[7] Appellant complied with the trial court's directive to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

[8] The Commonwealth suggests that Appellant's claim is waived because his Pa.R.A.P. 1925(b) statement — which presents the same general claim as in his brief — was not "sufficiently specif[ic.]" ***See*** Commonwealth's Brief at 8; Appellant's Statement of Matters Complained of on Appellant Pursuant to Pa.R.A.P. 1925(b), 8/30/22. ***See also*** Pa.R.A.P. 1925(b)(4)(ii) ("The Statement shall concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge."). While we agree Appellant should have specified the factual or legal errors he believes the trial court made in denying his motion to suppress, the trial court was able to respond to Appellant's claim. Thus, we decline to find it waived.

legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record[.]

*Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017) (citations omitted).

We begin by recognizing there are three types of interactions between law enforcement and private citizens:

The first is a mere encounter, sometimes referred to as a consensual encounter, which does not require the officer to have any suspicion that the citizen is or has been engaged in criminal activity. This interaction also does not compel the citizen to stop or respond to the officer. A mere encounter does not constitute a seizure, as the citizen is free to choose whether to engage with the officer and comply with any requests made or, conversely, to ignore the officer and continue on his or her way.

The second type of interaction, an investigative detention, is a temporary detention of a citizen. This interaction constitutes a seizure of a person, and to be constitutionally valid[,] police must have a reasonable suspicion that criminal activity is afoot.

The third, a custodial detention, is the functional equivalent of an arrest and must be supported by probable cause. A custodial detention also constitutes a seizure.

No bright lines separate these types of encounters, but the United States Supreme Court has established an objective test by which courts may ascertain whether a seizure has occurred to elevate the interaction beyond a mere encounter. The test, often referred to as the "free to leave test," requires the court to determine whether, taking into account all of the circumstances surrounding the encounter, the police would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. Whenever a police officer

accosts an individual and restrains his freedom to walk away, he has seized that person.

***Commonwealth v. Anderson***, 276 A.3d 282, 293–94 (Pa. Super. 2022) (*en banc*) (citation omitted & some paragraph breaks added).

Here, the trial court determined that "the initial interaction of Officer Walsh knocking on the passenger-side window and [Appellant] rolling it down was a mere encounter." Trial Ct. Op. at 8. Nevertheless, the court found:

[W]hen Officer Walsh asked [Appellant] to step out of the vehicle, in combination with a marked police vehicle with its emergency lights activated parked behind [Appellant's] vehicle, the interaction immediately escalated to an investigative detention.

***Id.*** (footnote omitted). In other words, when Officer Walsh directed Appellant to exit his vehicle, Appellant was no longer "free to leave." ***See Anderson***, 276 A.3d at 294. We agree.[9]

Therefore, our focus is on the second type of interaction, an investigative detention:

To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that

_____

[9] Appellant appears to be under the misapprehension that the court did **not** conclude Officer Walsh's interaction with him evolved into an investigative detention when the officer directed him to exit his vehicle. ***See*** Appellant's Brief at 14 ("[T]he [t]rial [c]ourt abused its discretion [in finding] that the mere encounter did not evolve into an investigative detention when Appellant was ordered out of his vehicle, requiring a showing of reasonable suspicion and/or probable cause to do so."). This is simply incorrect. Moreover, Appellant **agrees** that Officer Walsh's initial contact began as a mere encounter when the officer knocked on the passenger window. ***See id.*** Accordingly, we need not consider Appellant's contention that the encounter quickly developed into an investigative detention because the trial court concluded that it did. ***See id.*** at 14-18.

the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion. The asserted grounds for an investigative detention must be evaluated under the totality of the circumstances. So long as the initial detention is lawful, nothing precludes a police officer from acting upon the fortuitous discovery of evidence suggesting a different crime than that initially suspected[.] However, an unjustified seizure immediately violates the Fourth Amendment rights of the suspect, taints the evidence recovered thereby, and subjects that evidence to the exclusionary rule.

*Commonwealth v. Hicks*, 208 A.3d 916, 927–28 (Pa. 2019) (citations & quotation marks omitted). Moreover, when considering whether an investigating officer possesses the requisite reasonable suspicion, we must bear in mind that:

Pennsylvania adheres to the vertical approach of the collective knowledge doctrine, which instructs that an officer with the requisite level of suspicion may direct another officer to act in his or her stead. However, where . . . the arresting officer does not have the requisite knowledge and was not directed to so act, we hold the seizure is still constitutional where the investigating officer with probable cause or reasonable suspicion was working with the officer and would have inevitably and imminently ordered that the seizure be effectuated. . . .

*Commonwealth v. Yong*, 177 A.3d 876, 889–90 (Pa. 2018) (citation omitted).

In the present case, the trial court determined Officer Walsh possessed the requisite reasonable suspicion to conduct an investigative detention of Appellant based upon Detective Corkle's observations:

Officer Walsh was working the HEAT detail with several other officers, including Detective Corkle, and they were in constant radio contact. Detective Corkle advised Officer Walsh that he observed [that Appellant] pull[ed] into the Howard Johnson, park[ed], exited his vehicle, walked to the sliding door of Room 107 and was handed an unidentified object from the

female inside. [Appellant] left in his vehicle and returned a short time later, parking close to the original spot. He again walked to the sliding glass door of Room 107 and handed an unidentified object to the female inside. Instead of leaving the parking lot, [Appellant] illegally parked in the fire lane near Room 107. Additionally, Detective Corkle testified that he observed the male reach into the backseat several times and pull a bag to his lap, and eventually put the bag in the backseat.

Detective Corkle testified that he has personally made undercover drug buys and utilized confidential informants. He further testified that the Howard Johnson hotel is a high-crime, high-drug area, and is in the top three (3) for illegal drug activity in Swatara Township. He has personally purchased illegal drugs as an undercover officer at the Howard Johnson, as well as has witnessed confidential informants purchase illegal drugs. Detective Corkle testified that drugs sales at the Howard Johnson are done in a variety of ways — in the room, through the window, in vehicles parked in the parking lot, and on foot outside of the hotel. Based upon his experience, he believed [Appellant's] actions were consistent with an illegal drug transaction.

Officer Walsh did not personally observe the actions of [Appellant], but he was directed by Detective Corkle to approach [Appellant]. Accordingly, this Court finds that Officer Walsh possessed reasonable suspicion to believe [Appellant] was involved in illegal drug activity to conduct to subject him to an investigative detention pursuant to the vertical collective knowledge doctrine.

Trial Ct. Op. at 8-9.

Appellant insists, however, that Detective Corkle's observations of him passing "'something' to a female in the Room 107 at the Howard Johnson Hotel" was insufficient to establish reasonable suspicion that criminal activity was afoot. *See* Appellant's Brief at 22. Rather, relying upon *Commonwealth v. Walton*, 63 A.3d 253 (Pa. Super. 2013), and *Commonwealth v. Banks*, 658 A.2d 752 (Pa. 1995), he maintains "the officer's observations were consistent with innocent activity and nothing more than [a] hunch that a drug

- 10 -

transaction was about to transpire." Appellant's Brief at 21 (emphasis omitted). Appellant emphasizes that Officer Walsh concocted a "fake noise complaint" to initiate contact with him and maintains that the officer had no reason to believe he was armed and dangerous; thus, he contends there was no basis to order him out of the vehicle. *See id.* at 27-28.

Upon our review, we conclude the trial court properly determined Officer Walsh possessed the requisite reasonable suspicion to conduct an investigative detention of Appellant, which included directing him to exit the vehicle. The trial court aptly summarized the observations of Detective Corkle, leading him to suspect Appellant was involved in **two** drug transactions, ten minutes apart. *See* Trial Ct. Op. at 8-9; N.T., 2/17/22, at 46. That information supported Officer Walsh's initial mere encounter with Appellant. Officer Walsh subsequently developed reasonable suspicion of criminal activity when — armed with Detective Corkle's observations of the suspected drug transactions and Appellant's interactions with the bag in the backseat — he observed Appellant "open the center console[,] throw something inside and then quickly shut it" immediately after making eye contact, and he detected "an overwhelming strong odor of marijuana coming from the vehicle" when Appellant rolled down the passenger window. *See* N.T., 2/17/22, at 13-14. Thus, at the time Officer Walsh directed Appellant to exit his vehicle, he had the following information: (1) he was assigned to the Howard Johnson hotel as part of a HEAT team because of the "high drug use and activity there[;]" (2) his experienced team member, Detective Corkle,

- 11 -

witnessed Appellant drive into the parking lot, approach one of the rooms, and "receive something from a female" before driving off again; (3) Detective Corkle witnessed Appellant do the same thing about 10 minutes later, but after that interaction, Appellant parked his vehicle in the fire lane; (4) Detective Corkle observed Appellant "reach into the backseat several times and pull a bag to his lap and eventually place[ ] the bag back into the backseat[;]" (5) as he approached the vehicle, Officer Walsh made "eye contact" with Appellant, at which time Appellant immediately "open[ed] the center console[,] thr[e]w something inside and the quickly shut it[;]" and (6) when Appellant rolled down his window, Officer Walsh "got an overwhelming strong odor of marijuana[.]" *See id.* at 7-10, 12-13, 46-47. We conclude that, under the totality of the circumstances, Officer Walsh possessed the requisite reasonable suspicion that Appellant was involved in criminal activity to support an investigative detention.

The cases upon which Appellant rely do not compel a different result. In *Walton*, a police officer observed a male and female pacing in the parking lot of a bar, while "on and off their cell phones several times looking around." *Walton*, 63 A.3d at 255 (record citation omitted). The officer found their actions "suspicious" and similar to those exhibited by drug dealers or users. *See id.* When the defendant's car pulled up to the male and female, the officer "immediately activated his lights and drove into the parking lot." *Id.* (record citation omitted). The male and female fled, and the officer observed the defendant "putting his hand down his pants . . . in an attempt to conceal

something." *Id.* (record citation & quotations omitted). After the officer asked the defendant to exit the vehicle, the officer observed the tip of a sandwich bag in the defendant's waistband. *Id.* A subsequent search revealed the bag contained cocaine; additional baggies and narcotics were recovered from the defendant's vehicle. *See id.*

The trial court denied the defendant's motion to suppress, and a panel of this Court reversed on appeal. The panel concluded the officer did not have "reasonable suspicion that [the defendant] was involved in criminal activity" — the officer did not witness any type of transaction before activating his lights and immediately driving into the parking lot, but simply observed two people pacing and looking at their phone, and "there was no indication that this was a high crime or drug intensive neighborhood." *Walton*, 63 A.3d at 258. Thus, the panel concluded: "Without more, [the officer's] observations [were] consistent with innocent activity and nothing more than a hunch a drug transaction was to transpire." *Id.*

Conversely, here, Officer Walsh's investigative detention of Appellant was supported by (1) Detective Corkle's observations of what appeared to be two drug transactions, as well as, Appellant's suspicious movements in his vehicle after parking in the fire lane; (2) his own observation of Appellant secreting an object in the center console after making eye contact with the officer; and (3) the overwhelming smell of marijuana emanating from Appellant's car. Thus, the facts supporting reasonable suspicion in the present case are of greater quantity and quality than those presented in *Walton*.

***Banks*** is also distinguishable. In that case, a police officer observed the defendant "reach[ ] into his pocket and hand[ ] an [unidentified] object to an unknown female who, in turn, gave [the defendant] an undetermined amount of cash." ***Banks***, 658 A.2d at 752. When the officer approached in his patrol car, the defendant fled. ***See id.*** After the officer apprehended the defendant, the officer immediately arrested him and recovered cocaine on his person. ***See id.*** Notably, the Commonwealth "admit[ted] that the stop and apprehension of [the defendant] was a **full arrest search** and not a ***Terry***-type[10] 'pat down[,]'" so that "[t]he central issue[ was] whether the arrest was based on **probable cause** under the Fourth Amendment." ***Id.*** (citation omitted & emphases added).

On appeal, the Supreme Court concluded that the evidence recovered from the search should have been suppressed. The Court held that "movement of an unknown item, or the mere exchange of an unknown item or items, plus flight, with nothing more, does not establish **probable cause** to arrest[.]" ***Banks***, 658 A.2d at 753 (emphasis added). The Court emphasized: (1) the officer witnessed **only one** exchange, and did not observe any drugs or containers commonly used to hold drugs; and (2) the officer was not responding to a complaint or tip regarding drug transactions. ***See id.***

---

[10] ***Terry v. Ohio***, 392 U.S. 1 (1968).

The present case is readily distinguishable. The question at issue in **Banks** was whether the police officer had **probable cause** to arrest the defendant, not, as here, whether the officer had **reasonable suspicion** to support an investigative detention. Indeed, the officer in **Banks** arrested the defendant after witnessing him participate in one suspicious hand-to-hand transaction and flee the scene when the officer approached. **See Banks**, 658 A.2d at 752. Here, Officer Walsh simply investigated Appellant after he was observed: (1) participating in two suspicious transactions in a high drug crime area; (2) interacting with a bag in the backseat of his vehicle that was parked in a hotel's fire zone; and (3) secreting something into the center console immediately after making eye contact with the officer. Additionally, when Appellant opened his car window, Officer Walsh recognized an overwhelming smell of marijuana in the vehicle.[11] Thus, **Banks** is not controlling.

Having determined that Officer Walsh possessed the requisite reasonable suspicion to investigate Appellant, we now turn to Appellant's claim challenging the officer's decision to remove him from the vehicle. **See** Appellant's Brief at 24-25, 27-28. Specifically, he insists that Officer Walsh had no reason to believe he was "armed and dangerous" to support a **Terry**

---

[11] We note Officer Walsh's investigation was not precluded by **Commonwealth v. Barr**, 266 A.3d 25 (Pa. 2021). In that case, the Supreme Court held that "the odor of marijuana **alone** does not amount to probable cause to conduct a warrantless search of a vehicle, but, rather, may be considered a factor in examining the totality of the circumstances." **Id.** at 44 (emphasis added). Here, the odor of marijuana was but one factor supporting Officer Walsh's reasonable suspicion to investigate Appellant.

- 15 -

stop. *See id.* Appellant's argument is misplaced. Here, Officer Walsh did not order Appellant out of the vehicle so that he could **frisk** him. Rather, he did so for his own safety, based on the fact that he observed Appellant secrete something in the center console. *See* N.T., 2/17/22, at 14.

> Our Supreme Court has recognized expressly that an officer conducting a valid traffic stop may order the occupants of a vehicle to alight to assure his own safety. This is true even absent a reasonable suspicion that criminal activity is afoot.

*Commonwealth v. Palmer*, 145 A.3d 170, 173 (Pa. Super. 2016) (citations & quotation marks omitted). Because he did not direct Appellant to exit the vehicle so he could conduct a pat-down search, Officer Walsh was not required to possess reasonable suspicion that Appellant was armed and dangerous. Thus, this claim fails.

Appellant next challenges the voluntariness of his consent to search the vehicle.[12] He insists he had no choice but to agree to the search after he was ordered out of the vehicle by Officer Walsh "accompanied by at least three . . . other armed, and uniformed members of the HEAT detail[.]" Appellant's Brief at 31. Indeed, Appellant questions what other response would have been appropriate:

---

[12] To the extent Appellant relies upon argument and caselaw involving a consent to search provided after a defendant has been "unlawfully detained," we emphasize our conclusion, *supra*, that Appellant was **not unlawfully detained** by Officer Walsh. *See* Appellant's Brief at 29-30. Rather, the officer possessed the requisite reasonable suspicion to investigate and briefly detain him.

- 16 -

Perhaps a defendant should respond in the negative, thereby further jeopardizing officer safety by escalating the use of force continuum to effectuate the search? Imaginably, the defendant should simply flee to avoid apprehension or search, thereby endangering not only law enforcement officials but also the community at large. Unsurprisingly, the correct course of action is acquiescence to the instructions of law enforcement and pray a [c]ourt recognizes the readily apparent; that Appellant felt he had no choice but to acquiesce to the requests of law enforcement under the circumstances.

*Id.* at 31-32 (emphasis omitted). He emphasizes that he was stopped "for a fake, pretextual noise complaint, was surrounded by four . . . additional armed uniformed officers, and was never advised of his absolute, constitutional right to refuse consent to search his vehicle." *Id.* at 32. Under these circumstances, Appellant argues that he had no choice but to consent to the search. *See id.*

In considering the validity of a defendant's consent to search, we begin with the premise that "[w]here the underlying encounter is found to be lawful, voluntariness [of the consent] becomes the exclusive focus." *Commonwealth v. Strickler*, 757 A.2d 884, 888-89 (Pa. 2000).

[T]he Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice — not the result of duress or coercion, express or implied, or a will overborne — under the totality of the circumstances. [W]hile knowledge of the right to refuse to consent to the search is a factor to be taken into account, the Commonwealth is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent. Additionally, although the inquiry is an objective one, the maturity, sophistication and mental or emotional state of the defendant (including age, intelligence and capacity to exercise free will), are to be taken into account. . . .

- 17 -

*Id.* at 901 (citations omitted). This Court has considered the following factors relevant in determining whether a defendant's consent was valid:

1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including the degree of coerciveness; 8) whether the person has been told that he is free to leave; and 9) whether the citizen has been informed that he is not required to consent to the search.

*Commonwealth v. Benitez*, 218 A.3d 460, 480 (Pa. Super. 2019) (citation omitted).

In concluding Appellant's consent to search was voluntary, the trial court opined:

The interaction was recorded on Officer Walsh's body camera. The video depicts [Appellant] standing at the rear of his vehicle, Officer Walsh standing in front of him having a conversation, and another uniformed officer standing to the left and slightly behind [Appellant]. Officer Walsh asked [Appellant] what he threw into the center console, and [Appellant] said it was his blunt. [Appellant] then produced his medical marijuana card for Officer Walsh and explained he had just moved to Kentucky.

Officer Walsh asked [Appellant] for his driver's license, which he produced, along with a temporary license from Kentucky. He then asked [Appellant] about what his plans were for the evening, and then explained that Pennsylvania's medical marijuana law does not permit an individual to consume it by smoking. The two had a brief conversation about medical marijuana and agreed that the law did not make sense, but Officer Walsh said it was the law, nonetheless. During this conversation, a third . . . uniformed officer is standing to the left of Officer Walsh and in proximity to [Appellant]. Officer Walsh handed [Appellant's] driver's license and medical marijuana card to that officer who went back to his vehicle to presumably run the information.

[Appellant] asked why there were so many officers for someone smoking marijuana, and Officer Walsh said that they were at Howard Johnson to investigate a noise complaint when he observed [Appellant] in his vehicle. He then asked [Appellant] how much marijuana was in the car and [Appellant] responded that he was "just rolling a blunt." [Appellant told] Officer Walsh that he put the blunt in the center console. Thereafter, Officer Walsh asked [Appellant] if he could search the vehicle while the other officer ran his information. [Appellant] responded, "go ahead — I don't got nothing to hide."

This Court finds no evidence that [Appellant's] consent was not voluntarily given. First, there was no excessive or overwhelming police presence. The body camera footage shows a total of three . . . uniformed officers and at least one . . . marked police vehicle directly behind [Appellant's] vehicle. Second, no physical contact occurred between [Appellant] and the officers. [Appellant] was not in custody and remained freely standing in the parking lot while officers and [Appellant] maintained a cordial tone. Third, officers did not direct [Appellant's] movements beyond asking him to step out of the vehicle. Fourth, with respect to the officer's demeanor, they maintained a polite and friendly conversational tone throughout the entire investigation. In fact, Officer Walsh can be heard laughing at one point. Fifth, the investigation occurred in the parking lot of Howard Johnson where [Appellant's] vehicle was illegally parked in the fire lane.

As described above with respect to the content of the questions and statements, Officer Walsh engaged in standard questioning of [Appellant]. He asked [Appellant] standard questions about what he was doing, where he was going, and appropriate follow-up questions based upon [Appellant's] answers. [Appellant's] entire interaction with officers was conversational and calm. None of the officers raised their voices at [Appellant] or exerted any physical control over him. There were no signs of duress or use of any coercive tactics as a means of inducing consent. Officer Walsh explicitly asked [Appellant] if he could search his vehicle to confirm that the only marijuana in the vehicle was the blunt he was about to smoke, and [Appellant] consented. Lastly, while [Appellant] was never expressly told that he was free to leave or that he did not have to consent, this Court finds that based on the totality of the circumstances, such an omission does not nullify [Appellant's] consent.

Trial Ct. Op. at 11-13 (record citations omitted).

- 19 -

Upon our review of the record, including Officer Walsh's body cam footage, we detect no basis to disturb the trial court's ruling. Both Officer Walsh and Appellant were cordial and respectful of each other.[13] Appellant was cooperative with the officers and candidly acknowledged that he stashed a rolled blunt in the center console. **See** Body Cam Footage at 1:00-1:05. He provided the officer with his Pennsylvania medical marijuana card and driver's license, as well as a temporary license from Kentucky where he stated he had recently moved. **See id.** at 1:05-1:34. Officer Walsh informed Appellant that it was not proper to smoke medical marijuana in Pennsylvania, and both Appellant and another officer joked that the law did not make sense. **See id.** at 2:07-3:01. Although there were two or three additional officers present on the body cam footage, none of them touched Appellant, directed his movement, or drew their weapons. About four minutes after his initial approach, Officer Walsh asked Appellant, "How much weed to do you have in the car?" to which Appellant responded, "I was just rolling a blunt." **Id.** at 3:57-4:01. He stated that it was in the middle console, and that he had "nothing to hide." **Id.** at 4:01-4:08. Officer Walsh then stated, "Well if that's

_____

[13] We reiterate the trial court's observation that the body cam footage exemplified how an interaction between police and a citizen should be conducted. **See** N.T., 2/17/22, at 64 ("I see a lot of surveillance body cam videos [and t]his is probably one that ought to be used in . . . training . . . as to how to conduct an investigation with total courtesy [and] professionalism"), 69 (court commending Appellant on how he "interact[ed] with the police without having things escalate"); N.T., 7/22/22, at 26 (court noting "how impressed [it] was with the police officers" during the encounter, and "how perfectly polite and civilized" Appellant was).

the case . . . do you mind if I check your car to make sure that's all you have in there?" ***Id.*** at 4:28-4:32. Appellant gestured toward the car and said, "Go ahead. I ain't got nothing to hide." ***Id.*** at 4:32-4:34. At no time did Appellant appear nervous or under duress, and Officer Walsh's tone at all times was conversational.

We conclude the facts in the present case are similar to those in ***Benitez***. In that case, at 11:55 p.m., the officer conducted a traffic stop of the defendant's vehicle because it had a suspended registration. ***Benitez***, 218 A.3d at 463. The defendant, who had one passenger, pulled over without incident. ***See id.*** The officer approached the passenger side and asked for the defendant's license, registration and insurance, which the defendant eventually provided. ***See id.*** at 463-64. The defendant indicated it was his friend's car. ***See id.*** Upon questioning, the defendant told the officer he was coming from New York to Philadelphia to see his girlfriend. ***See id.*** at 464. The officer had requested backup, who arrived approximately six minutes after the stop. ***See id.***

The two officers discussed the fact that the defendant presented some "indicators of drug trafficking," including the fact that the vehicle was being operated with a single key, had an expired registration and insurance, was registered to someone in Pennsylvania although the defendant was from New York, and was a "third party car with a new tag[.]" ***Benitez***, 218 A.3d at 464-65 (record citations & quotation marks omitted). Approximately 13 minutes after the stop, an officer asked the defendant to step out of the vehicle and

- 21 -

walked him to the curb. ***See id.*** at 465. He then "asked [the defendant] if he had any weapons on him and whether [he] minded if the officer frisked him." ***Id.*** (record citation & quotation marks omitted). The defendant raised his hands in response, and the officer continued to ask him about his travel while conducting a pat-down frisk. ***See id.*** The officers eventually received information that there was "an open investigation" of the defendant and that he had been stopped in the past in a car with a hidden compartment for drugs. ***See id.*** at 465-66.

During the course of the stop, two additional officers arrived, one with his K-9 unit. ***See Benitez***, 218 A.3d at 466. The K-9 detective spoke with the defendant and asked if he could remove food bags from the car since he was going to conduct a K-9 search. ***See id.*** at 468. The defendant agreed. Thereafter, the detective asked if there were any drugs in his car, to which the defendant responded, "No." ***Id.*** (record citation & quotation marks omitted). The detective then asked if they could search the car, and the defendant said "Yes, that's fine." ***Id.*** (record citation & quotation marks omitted). The K-9 unit indicated the presence of narcotics, and the officers subsequently discovered a hidden compartment containing more than 4 grams of heroin. ***See id.*** at 468-69. The request to search was made about 30 minutes after the initial stop. ***See id.*** at 467.

The trial court denied the defendant's pretrial motion to suppress, and on appeal, the defendant argued, *inter alia*, that "his consent to a K-9 search was [not] valid under the circumstances." ***See Benitez***, 218 A.3d at 478. He

emphasized: "[T]here were numerous uniformed police officers at the scene, he was frisked and ordered to remain outside of the car, and [the officer] retained the paperwork that [the defendant] had passed to [him]." *Id.* Moreover, the officers "failed to use a standard consent form to ensure an informed and voluntary consent[,]" and failed to inform him he had the right to refuse the search. *Id.* Additionally, the defendant noted that "it did not appear [he] had any real choice in the matter since the K-9 search appeared imminent regardless of what he said." *Id.* at 479 (record citation omitted).

Upon review, a panel of this Court affirmed the trial court's ruling that the defendant's consent to search "was a free and unconstrained choice." *Benitez*, 218 A.3d at 483. In finding the consent was voluntary, the trial court noted: (1) although there were a "handful of . . . officers present at the scene of the traffic stop[,]" there was not an "excessive or overwhelming police presence[;]" (2) the defendant was not in custody or physically restrained; (3) the officers did not "direct [the defendant's] movement" and "maintained a polite and conversational tone[;]" (4) "the police engaged in standard questioning of the" defendant; (5) "[t]here were no signs of duress or use of any coercive tactics . . . as a means of inducing [the defendant's] consent[;]" and (6) although the officers did not inform the defendant of his right to refuse the search, that "factor did not outweigh the totality of the circumstances that [his] consent . . . was voluntary." *Id.* at 482-83 (record citation omitted). The *Benitez* panel determined the record supported the

trial court's findings, and therefore rejected the defendant's challenge to the voluntariness of his consent. *Id.* at 483.

The facts in the present case are even more benign than those presented in *Benitez*. As in *Benitez*, both Appellant and the officers were cordial and spoke in a conversational tone. There is no indication Appellant was under duress or that the officers coerced him into providing consent to search. In fact, Appellant agreed to the search less than five minutes after he was approached. Moreover, when Officer Walsh asked for Appellant's consent, he was already aware that Appellant possessed marijuana (a controlled substance) in the vehicle, and that he was using it in a manner inconsistent with medical marijuana laws. Thus, Appellant is entitled to no relief.

Lastly, Appellant contends that the search of his vehicle was violative of *Alexander*, which requires a showing of both probable cause and exigent circumstances in order to justify a warrantless search of a vehicle. *See* Appellant's Brief at 33-34. However, Appellant fails to acknowledge that **consent to search** is an exception to the warrant requirement. *See Commonwealth v. Knupp*, 290 A.3d 759, 769 (Pa. Super. 2023). Accordingly, here, "Appellant relieved the Commonwealth of any burden to show . . . probable cause and exigent circumstances for a warrantless automobile search by consenting to a search." *See id.* Because we have already determined Appellant's consent was valid, his final challenge to the trial court's suppression ruling fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/06/2023