J-S33024-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DOMINIQUE ROPER | : | No. 3295 EDA 2024 |

Appeal from the Order Entered December 5, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0006188-2022

BEFORE:  BOWES, J., NICHOLS, J., and BECK, J.

MEMORANDUM BY NICHOLS, J.:                **FILED FEBRUARY 26, 2026**

The Commonwealth appeals from the order granting Appellee Dominique Roper's motion to suppress.[1]  The Commonwealth argues that the trial court erred by concluding that police did not have reasonable suspicion to conclude that Appellee was armed and dangerous.  After review, we affirm.

The trial court summarized the underlying facts of the case as follows:

On July 4, 2022, [Appellee] drove a white Ford Edge westbound on [the] 800 block of Luzerne Street in the city and county of Philadelphia.  [Appellee] turned his vehicle south onto 8th Street and after reaching the end of the block turned onto Pike Street. Philadelphia Police Officer Marc Kusowski was patrolling the area

---

[1] In its notice of appeal, the Commonwealth certified that the trial court's suppression order would terminate or substantially handicap the prosecution of its case.  **See** Pa.R.A.P. 311(d) (stating that "in a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution"); **see also** Notice of Appeal, 12/9/24; Commonwealth's Brief at 1.

with his partner Officer Lane. The police officers observed that the brake lights on [Appellee's] vehicle were not functioning and subsequently observed [Appellee] making the turn from 8th Street onto Pike Street without properly engaging a turn signal. Due to witnessing these two traffic violations, officers Kusowski and Lane drove up behind [Appellee's] vehicle to complete a search of the license plate number. The police officers then initiated a traffic stop. Officer Kusowski exited his police car and walked up to [Appellee's] vehicle on the passenger side while Officer Lane approached the driver's side. [Appellee] was the operator and sole occupant of the vehicle. Officer Lane asked for [Appellee's] paperwork and [Appellee] provided his driver's license but stated that he did not have paperwork for the vehicle because it was his mother's car. [Appellee] searched the center console of the vehicle for paperwork but found nothing relevant. Officer Kusowski observed that [Appellee] had a large quantity of fireworks on the backseat of the vehicle. Officer Lane walked back to his police vehicle to complete an identification search using [Appellee's] driver's license. Officer Kusowski continued to stand at the rear passenger side of the vehicle and proceeded to ask [Appellee] if he had a permit to carry firearms. Officer Kusowski then asked repeatedly if [Appellee] possessed a firearm. [Appellee] responded to Officer Kusowski, "Yeah, yes-- just no," and repeated "Yes, no just fireworks" when asked again. Officer Kusowski responded by stating, "Sir, no, I'm asking you about a firearm" and [Appellee] again responded "Yes-- no, no." Officer Kusowski then said, "Sir, I'm not going to find a firearm in this car?" [Appellee] answered, "Yes – no." The police officers then ordered [Appellee] to exit his vehicle. [Appellee] questioned the legality of the police request and then exited the vehicle. Officer Kusowski performed a frisk of [Appellee] and discovered a firearm affixed to his waist. Officer Kusowski handcuffed [Appellee] and removed the firearm containing six live rounds from his waistband. The police officers completed a search of the firearm's serial number and discovered that it was in stolen status.

Trial Ct. Op., 3/25/25, at 1-3 (citations omitted and some formatting altered).

Appellee was arrested and charged with possession of a firearm prohibited, receiving stolen property, firearms not to be carried without a

license, and carrying firearms in public in Philadelphia.[2]  Appellee filed a motion to suppress on September 11, 2023.  Following a suppression hearing on December 5, 2024,  the trial court granted Appellee's motion to suppress.

The Commonwealth filed a timely notice of appeal.  Both the trial court and the Commonwealth complied with Pa.R.A.P. 1925.

On appeal, the Commonwealth raises the following issue:

Did the [suppression] court err by ordering suppression where [Appellee] was stopped in an area notorious for shootings and gun crimes after committing traffic violations, consistently gave ambiguous and self-contradictory "yes -- no" answers when asked whether he had a gun or a permit to carry one, agreed that an officer would find a gun if he searched the car, and first ignored and then rejected an officer's request to step out of his car?

Commonwealth's Brief at 4.

The Commonwealth contends that the suppression court "erred as a matter of law by concluding that Officer Kusowski's observations and experience did not provide reasonable suspicion that [Appellee] was armed." *Id.* at 12.  Specifically, the Commonwealth contends that the frisk of Appellee was justified because Appellee "was pulled over in an area 'prolific' for its number of shootings, gun crimes, and narcotics sales[,]" "repeatedly gave evasive, misleading answers when asked whether he had a gun permit or whether there was a gun in his car[,]" was observed to be sweating during the traffic stop, and did not cooperate when police asked him to step out of his vehicle.  *Id.* at 14-15 (footnote omitted).  The Commonwealth also argues

_____

[2] 18 Pa.C.S. §§ 6105, 3925(a), 6106(a)(1), and 6108, respectively.

- 3 -

that the suppression court erred by disregarding Officer Kusowski's training in recognizing behavior signs indicating gun possession, his experience as an officer in making gun arrests, and his familiarity with the area of the traffic stop. *See id.* at 16. Additionally, the Commonwealth asserts that the suppression court "erred by offering potentially innocuous explanations for factors that could objectively be construed as suspicious" such as Appellee's sweating being due to the hot weather on the date of the stop or that Appellee's conflicting answers were due to confusion based upon the way Officer Kusowski asked Appellee questions. *Id.* at 17. Further, the Commonwealth argues that the suppression court "erred by imagining hypothetical factors that were not present rather than focusing on those that were, viewed in their entirety." *Id.* at 18-19 (citation omitted).

Our standard of review for a challenge to a suppression court's granting of a motion to suppress is well settled:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Korn*, 139 A.3d 249, 252-53 (Pa. Super. 2016) (citation omitted).

Further, while "[o]ur standard of review is restricted to establishing whether the record supports the suppression court's factual findings[,] . . . we maintain *de novo* review over the suppression court's legal conclusions." **Id.** at 253 (citation omitted). Additionally, this Court has explained:

> With respect to a suppression court's factual findings, it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented.
>
> At a suppression hearing, the Commonwealth has the burden of establishing by a preponderance of the evidence that the evidence was properly obtained.

**Commonwealth v. Heidelberg**, 267 A.3d 492, 499 (Pa. Super. 2021) (*en banc*) (citations omitted and some formatting altered). Further, it is well established that an appellate court may affirm a suppression court on any ground supported by the record. **See Commonwealth v. Hightower**, 340 A.3d 1015, 1022-23 (Pa. Super. 2025) (*en banc*).

As this Court has previously stated:

> The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee the right of the people to be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures. To secure the right of citizens to be free from unreasonable search and seizure, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty.
>
> An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates the protections of Article 1, Section 8 of the Pennsylvania Constitution. To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot. Reasonable suspicion

requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.

*Commonwealth v. Miller*, 333 A.3d 470, 477 (Pa. Super. 2025) (citations

omitted and some formatting altered).

> Incident to a lawful traffic stop,
>
> an officer may check the vehicle's registration, the driver's license and obtain any information necessary to enforce provisions of the motor vehicle code. Additionally, police may request both drivers and their passengers to alight from a lawfully stopped car as a matter of right.
>
> Allowing police officers to control all movement in a traffic encounter is a reasonable and justifiable step towards protecting their safety.
>
> If, during the course of a valid investigatory stop, an officer observes unusual and suspicious conduct on the part of the individual which leads him to reasonably believe that the suspect may be armed and dangerous, the officer may conduct a pat-down of the suspect's outer garments for weapons. In order to establish reasonable suspicion, the police officer must articulate specific facts from which he could reasonably infer that the individual was armed and dangerous. When assessing the validity of a *Terry*[3] stop, we examine the totality of the circumstances, giving due consideration to the reasonable inferences that the officer can draw from the facts in light of his experience, while disregarding any unparticularized suspicion or hunch.
>
> While the law of search and seizure is constantly evolving, its focus remains on the delicate balance of protecting the right of citizens to be free from unreasonable searches and seizures and protecting the safety of citizens and police officers by allowing police to make limited intrusions on citizens while investigating crime. The court must be guided by common sense concerns, giving preference to the safety of the officer during an encounter with a suspect where circumstances indicate that the suspect may have, or may be reaching for, a weapon.

_____

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

*Commonwealth v. Mack*, 953 A.2d 587, 589-90 (Pa. Super. 2008) (citations omitted and some formatting altered).

Additionally, in considering the totality of the circumstances, "appellate courts have disapproved of a 'divide-and-conquer' approach of considering individual factors in isolation from each other." *Commonwealth v. Benitez*, 218 A.3d 460, 471 (Pa. Super. 2019) (citations omitted). Further, a "suppression court is not foreclosed from concluding that reasonable suspicion" existed even "where one could say that the conduct of a person is equally consistent with innocent activity[.]" *Id.* (citation omitted). Ultimately, "[i]n conducting a reasonable suspicion inquiry, a suppression court is required to afford due weight to the specific, **reasonable** inferences drawn from the facts in light of the officer's experience." *Id.* (citation omitted and emphasis added).

Here, there is no dispute that the initial traffic stop was proper. *See* Appellee's Brief at 11 (conceding that "police officers initially conducted a proper *Terry* stop of [Appellee's] vehicle due to traffic violations" (citation omitted)). Therefore, we only address the validity of the *Terry* frisk.

At the conclusion of the suppression hearing, the trial court found as follows:

> [Officer Kusowski] testified that [Appellee] appeared to be fine -- calm rather until he asked [Appellee] about a firearm. The officer testified that [Appellee] had [sweat] on his -- began to [sweat] on his brow. And [Appellee] said, ["]yes -- just no. No, just fireworks.["] Indeed the video speaks for itself. I did not see any hesitation on [Appellee's] part as far as getting nervous during even the time the officer testified to. I will note that it was July

- 7 -

4th, 2022 in the City Philadelphia, so as far as [sweat] maybe a concern, but I did not see any kind of nervousness on behalf of [Appellee]. And the ["]yeah no yeah no[" answer,] unfortunately tend[s] to be something that generations say today that tends to be kind of a thing that people say as opposed to answering a question properly. Additionally, the officers . . . . were looking in the back of the car. The officer testified that there were fireworks in the back of the car, so they are looking at the fireworks and they [are] asking him about fireworks so that can be a source of confusion. Long story short it doesn't appear that [Appellee] is nervous upon asking about the firearms. It also appears that [Appellee] confirmed when he said, ["]no, I don't have any firearms.["] It appears that the stop was . . . like an everyday stop, a calm stop. [Appellee] gives his identification and he states that -- he used the car to transport fireworks. That's it. So . . . this doesn't rise to the level of the officer quote unquote fearing for his safety in this matter to then motion to his partner to. . . grab [Appellee] out of the car.

N.T. Suppression Hr'g, 12/5/24, at 28-29 (some formatting altered).

Following our review, we conclude that the suppression court's factual findings are supported by the record. *See Korn*, 139 A.3d at 252-53. Specifically, we agree with the suppression court that Appellee did not hesitate in answering Officer Kusowski's questions, nor did he appear nervous during the encounter with police. *See* Commonwealth Exhibit C-11 (Bodycam Footage) at 1:17-3:47.[4] Further, we agree with the suppression court that Appellee calmly answered the officers' questions and provided the officers with his identification when asked. *See id.* at 2:00-3:47. Finally, we agree with

---

[4] The audio from the bodycam footage was not transcribed. The trial court included the bodycam footage in a supplemental certified record. We therefore cite to the bodycam footage by timecode.

the suppression court that Appellee ultimately confirmed that he did not have a firearm.  *See id.*[5]

As to its legal conclusions, the suppression court explained the following:

> This court found . . . that the police officers failed to establish reasonable suspicion before performing a ***Terry*** frisk of [Appellee].  Testimony provided by Officer Kusowski regarding [Appellee's] demeanor and responses to the questions differed from . . . Officer Kusowski's bodycam footage.  In contrast with Officer Kusowski's statements that [Appellee's] demeanor changed and he began to sweat after being questioned about a firearm license, [Appellee's] demeanor observed on [the] bodycam [footage] did not change when he was questioned and there was no sweat visible.  Even if Officer Kusowski's assertion that [Appellee] was sweating was uncontroverted, sweating would have been reasonable and not suspicious as the stop occurred on

---

[5] We note that the Commonwealth argues that Appellee was "pulled over in an area 'prolific' for its number of shootings, gun crimes, and narcotics sales" and that Appellee attempted to evade the frisk.  Commonwealth's Brief at 14-15.  However, the suppression court made no such factual finding and did not make a finding that the area was a high crime area.  *See* N.T. Suppression Hr'g, 12/5/24, at 28-29; *see also* Trial Ct. Op, 3/25/25, at 7-8.  To the extent that the Commonwealth now argues that the vehicle stop occurred in a high crime area, we note that the Commonwealth failed to argue that point to the suppression court.  *See* N.T. Suppression Hr'g, 12/5/24, at 26-28.  Since the Commonwealth failed to argue to the suppression court that the stop occurred in a high crime area, we find that argument waived on appeal.  *See* ***Commonwealth v. Dunham***, 203 A.3d 272, 276-77 (Pa. Super. 2019) (finding waiver where the Commonwealth failed to argue a defendant's flight in a high crime area supported denial of suppression); *see also **Heidelberg***, 267 A.3d at 499; Pa.R.Crim.P. 581(H); Pa.R.A.P. 302(a) (stating that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal").  Further, even if we did not find that argument waived, the trial court was within its discretion in failing to find that the area was a high crime area.  ***See Commonwealth v. Lewis***, 343 A.3d 1016, 1036 (Pa. 2025) (explaining that "it is ultimately up to suppression courts to determine if the Commonwealth has met its burden of proof" to establish an area was a high crime area (footnote omitted)).

the morning of July 4, 2022. The bodycam footage showed that [Appellee] was confused by the questions regarding firearms and looked at the fireworks in the vehicle when questioned. The facial expressions of [Appellee] coupled with his responses demonstrated that he believed that Officer Kusowski was asking about the fireworks that filled the back of the vehicle. Officer Kusowski asked questions quickly and in a manner that would have led any reasonable person to be confused. Aside from [Appellee's] uncertain replies . . . there were no other actions that contributed to establishing reasonable suspicion. The stop occurred during the daytime and, apart from brief questions regarding the legality of being ordered to exit his vehicle, [Appellee] followed the instructions of the police officers. Additionally, [Appellee] did not engage in any furtive movements which would suggest that criminal activity is afoot. In considering the totality of the circumstances, there was not enough evidence provided on the record to prove that the police had reasonable suspicion that any crime was afoot aside from the motor vehicle violations.

Trial Ct. Op., 3/25/25, at 7-8.

As noted, the Commonwealth argues that the suppression court's analysis was erroneous because it improperly considered hypothetical factors that were not present in this case, including the fact that the stop did not occur at night, that Appellee did not make furtive movements, and that Appellee was not uncooperative with the police. **See** Commonwealth's Brief at 18-19. Following our review of the record, we agree with the Commonwealth that the suppression court engaged in a flawed analysis by considering factors that were not present in this case. **See Commonwealth v. Bozeman**, 205 A.3d 1264, 1276 (Pa. Super. 2019) (finding error where a suppression court focused on factors that were not present in determining reasonable suspicion); **see also Benitez**, 218 A.3d at 471 (disapproving of a

divide-and-conquer approach that considers factors in isolation from each other). However, we are not bound by the suppression court's legal conclusions, as our scope of review is *de novo*, and it is well established that we may affirm a suppression court on any basis supported by the record. *See Korn*, 139 A.3d at 252-53; *Hightower*, 340 A.3d at 1022-23.

On this record, and based on our review of the uncontroverted bodycam video, we affirm the suppression court's grant of suppression, albeit on a slightly different basis.[6] *See Hightower*, 340 A.3d at 1022-23. As the suppression court correctly found, the bodycam video established that Appellee was cooperative with police, did not exhibit signs of nervousness during the stop, and did not hesitate in answering Officer Kusowski's questions. Additionally, as stated above, we agree with the suppression court that Appellee's responses to Officer Kusowski's questions reflect that he ultimately denied possessing a firearm.

The Commonwealth argues that the suppression court erred by failing to give due weight to Office Kusowski's training and experience[7] and by

---

[6] The bodycam footage was uncontroverted at the suppression hearing. *See* N.T. Suppression Hr'g, 12/5/24, at 25-26 (both parties agreeing that "the video speaks for itself"). To the extent that our legal conclusion requires additional factual findings, we note that we may fills gaps in the factual findings with the appellee's evidence from the hearing and any uncontradicted evidence from the appellant. *See Miller*, 333 A.3d at 476.

[7] To the extent that the Commonwealth is asking us to reweigh Officer Kusowski's testimony, we note that it is the sole province of the suppression court to weigh the credibility of the witnesses, and the suppression court is

*(Footnote Continued Next Page)*

"offering potentially innocuous explanations for factors that could objectively be construed as suspicious" such as Appellee's "yeah, no" answers to Officer Kusowski's questions and the officer's observation that Appellee was sweating. *See* Commonwealth's Brief at 16-17. However, we reiterate that a suppression court must give "due consideration to the **reasonable** inferences that the officer can draw from the facts in light of his experience, while disregarding any unparticularized suspicion or hunch." *Mack*, 953 A.2d at 590 (citations omitted and emphasis added).

Here, based on the totality of the circumstances present in this case, we reject the Commonwealth's contention that Appellee's behaviors could objectively be construed as suspicious. To the extent Officer Kusowski inferred that Appellee's conduct was suspicious based on his answers to police

_____

entitled to believe all, part or none of the evidence presented. *See Heidelberg*, 267 A.3d at 499. Additionally, while the suppression court did not make a credibility finding about Officer Kusowski's testimony, the suppression court explicitly concluded that the "[t]estimony provided by Officer Kusowski regarding [Appellee's] demeanor and responses to the questions differed from . . . Officer Kusowski's bodycam footage." Trial Ct. Op., 3/25/25, at 7.

Further, Officer Kusowski merely testified that he received training in recognizing behaviors of individuals that might possess a firearm. *See* N.T. Suppression Hr'g, 12/5/24, at 11. Officer Kusowski never explained how that training was relevant to the behaviors exhibited by Appellee. *See id.* at 9-24. Since Officer Kusowski did not demonstrate a nexus between his experience and Appellee's behaviors, the suppression court did not err in failing to credit Officer Kusowski's training and experience. *See Hightower*, 340 A.3d at 1024 (stating that an officer's experience only becomes relevant to a court's analysis of probable cause where the officer "demonstrate[s] a nexus between his experience and the search, arrest, or seizure of evidence" (citations omitted)).

questioning and the fact that Appellee was sweating during the initial stop, those conclusions are not reasonable or supported by the record. *See Benitez*, 218 A.3d at 471 (stating that a suppression court must give "due weight to the specific, **reasonable** inferences drawn from the facts" (citation omitted and emphasis added)); *Mack*, 953 A.2d at 590 (stating that a suppression court must give "due consideration to the **reasonable** inferences that the officer can draw from the facts in light of his experience, while disregarding any unparticularized suspicion or hunch" (citations omitted and emphasis added)).

As to the exchange between Officer Kusowski and Appellee regarding the presence of firearms, we note that the video establishes that loud music was playing in the background during the exchange, that Officer Kusowski asked his questions quickly, and that there were fireworks in the back of the vehicle. *See* Bodycam Footage at 1:32-1:35, 2:50-3:46.

Additionally, we do not agree with the Commonwealth's contention that Appellee's answers were contradictory, evasive, or objectively suspicious. *See* Commonwealth's Brief at 14-15, 17, 19. In relevant part, Appellee's exchange with Officer Kusowski was as follows:

> Officer Kusowski: . . . Do you have a permit to carry a firearm?; Any firearms in the car?
>
> Appellee: Yeah, naw, its . . . [points to fireworks in the back seat] no.
>
> Officer Kusowski: No guns in the car?
>
> Appellee: Yeah, naw [inaudible].

- 13 -

Officer Kusowski: Ok, no permit?

Appellee: Naw, yeah.

Officer Kusowski: Ok.

[Approximately ten seconds elapses].

Officer Kusowski: When I asked you, you kind of hesitated. So, if I were to check the car, I'm not going to find any guns in the car?

Appellee: Yeah, naw, it's just, it's just the fireworks [gestures to fireworks again].

Officer Kusowski: [Laughs] No, no, no. Not fireworks; firearm.

Appellee: Yeah, no.

Officer Kusowski: Just the fireworks? 'Cause you're getting real nervous now.

Appellee: Naw. Naw. Naw. It's just [inaudible].

Officer Kusowski: I understand. So, if I were to check the car, I'm not gonna find a gun in the car?

Appellee: Yeah but I mean I'm gonna have to ask my mom [the vehicle's owner] for permission to search the car.

Officer Kusowski: Ok – you – I just asked you if I were to check the car you would say that there was a gun in the car?

Appellee: Yeah, I said there wasn't no gun in the car. That's what I said. I said it's fireworks.

Officer Kusowski: Ok, alright.

Bodycam Footage at 2:50-3:46.

Under the circumstances presented in the bodycam video, we conclude Officer's Kusowski's inference that Appellee's answers were suspicious was unreasonable. *See Benitez*, 218 A.3d at 471; *Mack*, 953 A.2d at 589-90.

With respect to Officer Kusowski's testimony that Appellee was sweating during the traffic stop, we note that the bodycam video establishes that the

stop occurred on July 4, 2022, during the middle of summer, and that Appellee had all four of the vehicle's windows open. *See* Bodycam Footage at 2:50- 3:46. While the presence of sweat can certainly be an indicator of nervousness, it is an unreasonable inference to conclude that sweating on a summer day in a vehicle, which had all of its windows down for the duration of the stop, is an indication of nervousness, especially given the fact that Appellee did not otherwise appear nervous on the video.

Finally, the Commonwealth argues that Appellee's act of remaining in the vehicle once Officer Kusowski asked him to step out was indicative of Appellee's possession of a firearm. *See* Commonwealth's Brief at 15 (citing **Commonwealth v. Cunningham**, 287 A.3d 1, 12 (Pa. Super. 2022)). However, the Commonwealth's reliance on **Cunningham** is misplaced. In **Cunningham**, the officers approached a group of three men who they believed had been smoking marijuana. *See Cunningham*, 287 A.3d at 5. In concluding that the *Terry* frisk of one man was supported by reasonable suspicion, this Court concluded that "several circumstances that, while not dispositive on their own . . . , combined to support reasonable suspicion for the pat-down search." *Id.* at 11 (citation omitted). Those factors included the fact that, as the officers approached the men, the men "almost immediately became aggressive, cursed at the officers, and encircled the two officers." *Id.* Additionally, one of the officers testified that the men's "movements and aggressive tone led him to believe he was in danger [and that he] told his partner to call for help if anything happened." *Id.* (citation

omitted). Finally, the court credited the fact that right before the officer tried to pat-down the defendant, he kept moving away from the officer and tried to physically evade the officer's pat-down. *See id.* at 11-12.

Here, Appellee, with his hands raised in the air, merely stated "excuse me, you can't [inaudible]" twice before complying with the officer. *See* Bodycam at 3:57-4:02. Appellee did not attempt to move away from the officer or physically attempt to evade the pat-down like the defendant in *Cunningham*.[8] The case law of this Commonwealth is replete with cases where *physical* evasion of a frisk can support the conclusion that a defendant is armed and dangerous. *See, e.g., Cunninngham*, 287 A.3d at 12 (defendant's movement away from the officer and attempts to "scoot[] around [a] pole" to avoid the frisk were proper considerations); *In re T.W.*, 261 A.3d 409, 424 (Pa. 2021) (explaining that a juvenile's attempt to shield his body from the officers' view and act of reaching into his pockets when told not to were proper considerations); *Commonwealth v. Wright*, 224 A.3d 1104, 1110 (Pa. Super. 2019) (holding that resistance to multiple requests to exit a vehicle that required forcible removal from the vehicle was a proper consideration in a reasonable suspicion analysis). However, the Commonwealth does not cite, and the Court is unaware of, any case where

_____

[8] In fact, Officer Kusowski testified that Appellee did not "fight" being removed from the vehicle but rather that Appellee "hesitate[d]" and expressed that he did not believe the officer was allowed to remove him from the vehicle. N.T. Suppression Hr'g, 12/5/24, at 18.

- 16 -

verbal objections to being frisked or removed from a vehicle, without attempts at physical resistance or evasion, supported a finding of reasonable suspicion that a defendant was armed and dangerous.

Accordingly, because we agree with the suppression court that police lacked reasonable suspicion to believe that Appellee was armed and dangerous based on the totality of the circumstances and as presented in the uncontroverted bodycam video, we affirm the trial court's order. *See Korn*, 139 A.3d at 252-53; *Mack*, 953 A.2d at 589-90. On this record, we do not believe that the Commonwealth has established, based on the totality of the circumstances, that the officers had reasonable suspicion that Appellee was armed and dangerous. *See Mack*, 953 A.2d at 589-90. Accordingly, we affirm the suppression court's grant of suppression. *See Korn*, 139 A.3d at 252-53; *Hightower*, 340 A.3d at 1022-23.

Order affirmed. Jurisdiction relinquished.[9]

---

[9] On September 17, 2025, the Commonwealth filed an application for the correction of the record pursuant to Pa.R.A.P. 1926. *See* Commonwealth's Application to Correct the Record, 9/17/25. However, on September 22, 2025, the Commonwealth filed a praecipe to withdraw the application as moot. *See* Commonwealth's Praecipe, 9/22/25. Accordingly, we hereby grant the Commonwealth's praecipe.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/26/2026